### UNITED STATES of America

### v.

### COMMONWEALTH OF VIRGINIA.

### Civ. A. No. 76–623–R.

United States District Court,
E. D. Virginia,
Richmond Division.

July 24, 1978.

Griffin B. Bell, Atty. Gen. of the United States, J. Stanley Pottinger, Asst. Atty. Gen., Washington, D. C., Stephen Koplan, William White, Jerry E. Keith, and Daniel A. Searing, Federal Programs Section, Washington, D. C., Raymond A. Carpenter, Asst. U. S. Atty., Richmond, Va., for plaintiff.

Henry M. Massie, Jr., Leonard L. Hopkins, Asst. Attys. Gen., Richmond, Va., D. Patrick Lacy, Jr., Bell, Ellyson, Wilkins & Baliles, Richmond, Va., for defendant.

MEMORANDUM

WARRINER, District Judge.

I

On 23 December 1976 the United States brought suit in this Court against the Commonwealth of Virginia and the Superintendent of the Virginia State Police[1] to enforce the provisions of Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e *et seq.* and of § 518(c)(1) of the Omnibus Crime Control and Safe Streets Act of 1968 as amended, 42 U.S.C. § 3766(c)(1), and to protect certain rights guaranteed by the Constitution. By order entered 7 April 1977 plaintiff's claims under the Constitution and under Title VII were dismissed, and the action proceeded to trial on the merits of plaintiff's claim under the Omnibus Crime Control and Safe Streets Act of 1968 (hereinafter referred to as the Act).

The United States alleges that the Commonwealth of Virginia has discriminated against black applicants for civilian positions and against both black and female applicants for sworn positions in the Virginia State Police. The State Police is denominated a program or activity funded in part with Law Enforcement Assistance Administration (LEAA) funds made available under Chapter 46 of Title 42 of the United States Code, 42 U.S.C. §§ 3701, *et seq.*

The Crime Control Act of 1973 amended Section 518 of the Omnibus Crime Control and Safe Streets Act of 1968, 42 U.S.C. § 3766, to include for the first time a prohibition against, *inter alia,* racial and sexual discrimination by recipients of funds under the Act. Section 3 of the Crime Control Act of 1973, Pub.L.No. 93–83, provided that the anti-discrimination amendments would take effect on 1 July 1973. Thus, only those acts of discrimination which took place after 1 July 1973 will support a finding of discrimination in violation of § 3766(c). *See Hazelwood School District v. United States,* 433 U.S. 299, 309, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977). Evidence of pre-Act discrimination is nonetheless relevant to this case. *Hazelwood, supra* at 309–10, n. 15, 97 S.Ct. 2736. A showing of pre-Act discrimination would give meaning to post-Act patterns and practices of the defendants.

■ The Court finds that prior to 1 July 1973 the Virginia State Police discriminated against black applicants for civilian positions and against both black and female applicants for sworn positions. The practice of discrimination against female applicants for sworn positions was readily admit-

---

1. The interests of the defendants are the same, and both defendants were represented by the Attorney General of Virginia. Accordingly, hereinafter "defendant" shall refer to both defendants collectively.

ted by Captain Meredith S. Urick, who was Personnel and Training Officer for the Virginia State Police from the late 1940's until his retirement on 1 April 1972. Tr. 5–48. The discrimination against blacks in hiring for sworn and unsworn positions is not admitted by defendants, but is shown by the evidence nonetheless.

The statistical evidence of pre-Act discrimination is substantial. The evidence of the hiring of blacks by the Virginia State Police prior to 1969 consists of what the Supreme Court and the Fifth Circuit have termed "the inexorable zero." *Teamsters v. United States,* 431 U.S. 324, at 342, n. 23, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), quoting from *United States v. T. I. M. E.–D. C.,* 517 F.2d 299, at 315 (5th Cir. 1975). In the entire history of the Virginia State Police, only four blacks had ever been hired as troopers before 1973. No blacks had been hired prior to 1969. Plaintiff's Exhibit 21A. Plaintiff's Exhibit 8 is a list of 172 black applicants for trooper positions who applied between 1950 and 1972. Although this number is small in proportion to those who applied for trooper positions in this period, it is a substantial number and none were hired.

The statistical evidence of pre-Act discrimination alone would support an inference of discrimination. *See Roman v. ESB, Inc.,* 550 F.2d 1343, 1350 (4th Cir. 1976). When coupled with the direct evidence of discrimination, a *prima facie* case of pre-Act discrimination is made. The defendant's evidence is insufficient as a matter of law to rebut the plaintiff's prima facie case. *Teamsters v. United States,* 431 U.S. 324, 342–3, n. 24, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), *citing Alexander v. Louisiana,* 405 U.S. 625, 632, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972).[2] The Court finds that prior to the

effective date of the Crime Control Act of 1973, that is, up until 1969, the Virginia State Police maintained an all-white trooper force by purposefully excluding blacks.

## II

The Attorney General of the United States is empowered to bring suit under § 3766(c) whenever he has reason to believe a recipient government agency "has engaged or is engaging in a pattern or practice in violation of the provisions of this section." 42 U.S.C. § 3766(c)(3). Before proceeding to a detailed analysis of the evidence in this case, the Court must determine what legal standard is appropriate to such "pattern or practice" suits under the Crime Control Act. We deal with a welter of overlapping and interrelated laws, regulations and court decisions which make it difficult to ascertain what burden of proof is imposed on the federal government in such cases.

The plaintiff contends that the legal standards applicable to suits under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* are intended by Congress to apply to this § 3766 case. This view is bolstered by the clear statement to that effect found in the conference report on Publ.L.No. 94–503, H.R.Rep. 94–1723, 94th Cong., 2d Sess. (1976); U.S.Code Cong. & Admin.News 1976, p. 5374. Plaintiff says that it follows that the legal standard to be applied to this case is the standard enunciated in *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). Under *Griggs,* proof of discriminatory motive is not necessary in a Title VII case where the plaintiff complains of facially neutral employment practices that exhibit a disparate racial impact.

---

2. *Alexander* was a jury selection case, and the special nature of a jury venire as a group representative of a cross-section of the community distinguishes it from hiring cases such as the present case and *Teamsters.* However, this distinction apparently has not been recognized by the Supreme Court. *See Hazelwood,* 433 U.S. at 311, n. 17, 97 S.Ct. 2736, where the statistical method of calculation of standard deviations is imported to a hiring case from *Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), a jury selection case. Neither logic nor the rules of statistical analysis would permit the use of standard deviation analysis where selection is being made other than randomly. Tr. 4–44–6, 4–103–6, 10–35–9.

Plaintiff points as well to the regulations promulgated under the Crime Control Act on 18 August 1972, almost a year before § 3766(c) became effective. These regulations impose on recipients a duty to "conduct a continuing program of self-evaluation to ascertain whether any of their . . . policies . . . directly or indirectly have the effect of denying equal employment opportunities to minority individuals and women." 28 C.F.R. § 42.306(a). This provision seems to contemplate remedies based on an adverse impact theory of discrimination. Congress did nothing to require a change in this regulation in 1973 when the anti-discrimination amendments were adopted nor in 1976 when the legislation was re-enacted. Therefore, the plaintiff argues, Congress must have meant for the *Griggs* adverse impact standard to apply to cases under § 3766(c).

In *Lau v. Nichols,* 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1973) the Supreme Court upheld the claims of the plaintiff class brought by non-English-speaking Chinese-American students against the San Francisco public schools under a regulation promulgated by HEW pursuant to Title VI of the Civil Rights Act of 1964 which regulation prohibited practices which had the *effect* of discriminating even though no discrimination was intended. 414 U.S. at 568, 94 S.Ct. 786. Justice Stewart, joined by Chief Justice Burger and Justice Blackmun, concurred in the result but expressed doubt as to whether Title VI, standing alone, would sustain plaintiff's position were there no purposeful discrimination. However, the regulations which required affirmative action to overcome any language barriers were, Justice Stewart said, reasonably related to the purposes of the enabling legislation, and therefore binding on the defend-

ant. 414 U.S. at 569–71, 94 S.Ct. 786. In the present case, the regulation was not offered as a basis for liability but is here considered as a guide for the interpretation of the statute which followed it.[3]

Defendant, on the other hand, argues the rule of *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). *Washington* held that proof of discriminatory motive is necessary to establish a case of race discrimination under the Fifth Amendment (and by implication under the Fourteenth Amendment). Thus, defendant argues, mere disparate impact will not prove a case of discrimination under the Crime Control Act. Defendant arrives at this limitation by arguing that the anti-discrimination section of the Crime Control Act (42 U.S.C. § 3766(c)) was enacted by Congress under the authority of § 5 of the Fourteenth Amendment. Since *Washington* recognized limits on the Amendment itself, the legislation adopted pursuant to the Amendment cannot exceed those same limits. Thus, if proof of motive is required to support a finding of liability under the Fourteenth Amendment; mere proof of disparate impact must be insufficient to support a finding of liability under § 3766(c), a statute enacted under the authority of that Amendment.

This Court considered a similar proposition in the context of Title VII in *Friend v. Leidinger,* 446 F.Supp. 361, 384–87 (E.D.Va. 1977). In *Friend* this Court decided that proof of discriminatory intent is indeed necessary to establish a case of race discrimination in employment under Title VII where the defendant is either a State or a subdivision of a State. Since *Friend* was decided, however, two cases have been decided which cast doubt on the analysis of the Court in *Friend.*

**3.** The Court has considerable doubt as the validity of the antidiscrimination regulation promulgated by the Department of Justice prior to the effective date of the Crime Control Act of 1973. However, the Court need not reach the question of the validity of these regulations because the regulations were not cited in the complaint as a basis for liability nor were they raised at any point in the pretrial pleadings or

in the Final Pretrial Order. No evidence was introduced at trial for the purpose of showing a violation of the regulations. The regulations were first mentioned in plaintiff's post-trial brief and in a letter addendum to the post-trial brief. Under these circumstances, the Court cannot properly consider the regulations as a basis for liability.

In *United States v. City of Chicago,* 573 F.2d 416, (7th Cir. 1978), the Seventh Circuit held that the legal standard of proving a claim under the Fourteenth Amendment is not incorporated into Title VII by virtue of *Washington v. Davis.* The court analyzed the analogous cases of *Lassiter v. Northampton Election Bd.,* 360 U.S. 45, 79 S.Ct. 985, 3 L.Ed.2d 1072 (1959) and *Katzenbach v. Morgan,* 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966), dealing with English literacy tests for voting. In *Lassiter* the Supreme Court held that a North Carolina English literacy test did not necessarily violate the Fourteenth Amendment. In *Katzenbach v. Morgan* the Supreme Court considered the constitutionality of § 4(e) of the Voting Rights Act, which prohibited states from using English literacy tests as a requirement of voting. The Court held that the prior decision in *Lassiter* was inapposite to the question of the validity of the Voting Rights Act, and the question presented was instead whether the legislation was appropriate to enforce the Equal Protection Clause of the Fourteenth Amendment. 384 U.S. at 649–50, 86 S.Ct. 1717. The Court held in the affirmative. The Seventh Circuit, by analogy, concluded that Title VII, including the impact standard of *Griggs,* was an appropriate means of enforcing the Fourteenth Amendment in the employment field even as against a State subdivision. 573 F.2d at 422–24.

The second case which considered the issue after *Friend* is *United States v. South Carolina,* 445 F.Supp. 1094 (D.S.C.1977) (three-judge court), *aff'd mem.* 434 U.S. 1026, 98 S.Ct. 756, 54 L.Ed.2d 775 (1978). In that case, a unanimous three-judge panel consisting of Haynsworth and Russell, Circuit Judges, and Simons, District Judge, discussed the impact of *Washington v. Davis* on employment cases under Title VII and concluded that *Washington v. Davis* did not disturb the application of *Griggs* and that employment practices which display an adverse impact must be shown to be valid even where the employer is a governmental entity. 445 F.Supp. at 1112.

These cases lead the Court to believe that Congress has the power under § 5 of the Fourteenth Amendment to apply the impact standard of employment discrimination to the States in Title VII cases.

In any case, the defendant's argument is based on the assumption that Congress in passing § 3766(c) was acting pursuant to its power under the Fourteenth Amendment. Plaintiff contends, and the Court agrees, that § 3766(c) is more likely based upon the Spending Clause of Article 1, Section 8, of the Constitution. In *Lau v. Nichols, supra,* the Supreme Court made it clear that Title VI, the model for § 3766(c), was a proper exercise of the Spending Power: "The Federal Government has power to fix the terms on which its money allotments to the States shall be disbursed. *Oklahoma v. CSC,* 330 U.S. 127, 67 S.Ct. 544, 91 L.Ed. 794 (1947). Whatever may be the limits of that power, . . . they have not been reached here." 414 U.S. at 569, 94 S.Ct. at 789. The fact that the anti-discrimination provision is tied directly to a spending program also indicates that it is based upon the Spending Power. Either way, the defendant's argument fails.

In this same connection, however, it must be borne in mind that this is a "pattern or practice" suit brought by the Attorney General against an employer under § 3766(c)(3). Pattern or practice suits in the employment field trace their origins to the Dirksen-Mansfield amendments to the Civil Rights Act of 1964. 110 Cong.Rec. 12818–20 (1964). The Attorney General was authorized to bring a civil action against any employer who he has reasonable cause to believe "is engaged in a pattern or practice of resistance" to the rights secured by Title VII, "and that the pattern or practice is of such a nature *and is intended* to deny the full exercise" of Title VII rights. 42 U.S.C. § 2000e–6(a). (Emphasis added). Although this intent language is not found in § 3766(c)(3), which authorized this suit, the connection between Title VII and the anti-discrimination provisions of the Crime Control Act is so close that the intent language

of § 2000e–6(a) may be imputed to § 3766(c)(3).[4]

The language of § 2000e–6(a) thus plainly contemplates purposeful discrimination as the basis for a suit by the Attorney General. As the Supreme Court has noted, "disparate treatment was the most obvious evil Congress had in mind when it enacted Title VII." *Teamsters,* 431 U.S. at 335, n. 15, 97 S.Ct. at 1854. In view of the very language of the statute this Court is of the view that Congress did not intend to subject a governmental employer to liability in a suit brought by the Attorney General unless the employer were engaged in a widespread pattern and deliberate practice of thwarting the goals of Title VII. The courts have, however, applied the *Griggs* impact standard to pattern and practice cases under Title VII without such analysis.

In *United States v. Jacksonville Terminal Co.,* 451 F.2d 418 (5th Cir. 1971), *cert. den.* 406 U.S. 906, 92 S.Ct. 1607, 31 L.Ed.2d 815 (1972), the Fifth Circuit held that the United States need not prove a specific present intent to discriminate in a pattern or practice suit. The court said:

> [T]he Act proscribes facially neutral practices perpetuating the effects of past discrimination. If the practices have racially determined effects, proof of subjective intent to discriminate is unnecessary; the Government must show only that the defendant intended to perform the discriminatory act. [451 F.2d at 443.]

In *United States v. City of Chicago,* 573 F.2d 416 (7th Cir. 1978) the Seventh Circuit considered a pattern or practice complaint against the fire department of Chicago, Illinois, brought by the Attorney General under Title VII. Without discussing the question of whether Congress intended that pattern or practice suits be brought against employers who had no discriminatory purpose, the court held that the *Griggs* standard should apply to the case, and that proof of discriminatory motive was unnecessary.

The Eighth Circuit also indicated by implication that discriminatory motive need not be proved in pattern or practice cases in *Firefighters Institute for Racial Equality v. City of St. Louis,* 549 F.2d 506 (8th Cir. 1977). The court did not distinguish between the claims of the United States and those of the private plaintiffs when it held that discriminatory purpose need not be shown in Title VII cases brought under an adverse impact theory. 549 F.2d at 510.

Thus, although the Supreme Court has never considered in a State employee case the question of whether discriminatory intent is a necessary element of a *prima facie* case, the weight of the authority is that proof of impact alone is sufficient. This Court, then, will apply the standard of Title VII to this case with the *Griggs* impact theory rather than the *Washington* purposeful discrimination theory.

### III

The Court will now proceed to examine the claims of discrimination raised by the complaint. These are three: sex discrimination in hiring for sworn positions with the Virginia State Police, race discrimination in hiring for civilian positions with the State Police, and race discrimination in hiring for sworn positions with the State Police.

The plaintiff has sought to prove both disparate treatment and the disparate impact of neutral standards to show that the Virginia State Police have engaged in sex discrimination in hiring trooper applicants. The disparate treatment case rests upon the miniscule number of females hired by the Virginia State Police, the testimony of two female applicants, the failure of the Virginia State Police to recruit females for trooper positions, and the persistence in use of a height and weight requirement for trooper applicants. The plaintiff's case under a disparate impact theory is based upon the grossly disparate impact of the height and weight requirement on women.

---

4. See p. 1084, *supra.*

■ The first female trooper was hired by the Virginia State Police in 1976. Until that time there had never been a woman State Trooper in Virginia. Clearly this is an example of "the inexorable zero." The number of women presently employed and seeking employment is so low that the plaintiff does not argue that the proportion of women in sworn positions in the Virginia State Police should approximate the proportion of women in the civilian labor force in Virginia. Plaintiff does argue, however, that the number of women hired by the Virginia State Police would be substantially greater than it presently is in the absence of discrimination. Thus, the plaintiff's use of these statistics is in accord with the Supreme Court's view of the usefulness of such statistics found in *Teamsters* as proof of disparate treatment. 431 U.S. at 339, n. 20, 97 S.Ct. 1843.

Plaintiff's testimonial evidence of disparate treatment is, on the other hand, very weak. In part it consists of the testimony of two female applicants for trooper positions, Barbara Penn and Wanda Ricciardelli.

Barbara Penn, then a secretary in the office of the Assistant United States Attorney, testified that she had an interview with a Lieutenant Abbott of the State Police in the latter part of September 1977. She testified that Lt. Abbott told her that it would take some time to process her application and that he didn't hold out much hope that they could process her application before her 30th birthday in March of 1978. He invited her to file an application nevertheless. Despite this indication that time was critical Miss Penn did not actually submit her application until several weeks later. At the time of her testimony in February 1978, Miss Penn's application was being processed by the Virginia State Police. Tr. 1–164–69.

Wanda Ricciardelli testified that she applied to the Virginia State Police in January of 1977. In February, she received a letter notifying her that a freeze was in effect and that the State Police were not hiring at that time. In mid-May, Miss Ricciardelli was interviewed by a member of the Virginia State Police. She was interviewed a second time on 8 June 1977. On 22 July 1977 Miss Ricciardelli was notified that she would not be offered employment by the Virginia State Police. She tried repeatedly to ascertain the reason for her rejection, but the State Police told her only that they couldn't release the reasons for her rejection because they were confidential. She was, however, told that she had passed the age limit of 29 years in June of 1977 and that after that time, she was not eligible for employment. Miss Ricciardelli expressed doubt that this age problem was the only factor in her rejection. Miss Ricciardelli's testimony indicated that she had been hospitalized for an emotional disturbance in the spring of 1968, and that she had a problem with excessive absences at her secretarial job in Philadelphia. Tr. 3–37–47.

■ The Court does not believe that the evidence shows that either Miss Penn or Miss Ricciardelli was the victim of sex discrimination. When the Court asked counsel for plaintiff what was the relevance of Miss Penn's testimony, plaintiff's counsel said:

We wanted to show Your Honor that there was an applicant, a female applicant, that we considered to be qualified, who was under a certain degree of time restraint and needed to be considered and was not considered and there's also, as I think the testimony will show from other witnesses, there is a class approaching that is to be employed sometime in February—

THE COURT: Is it the position of the government that because she was a woman and she should have gotten particular treatment?

MR. WHITE: If you have a qualified female applicant and you're in an affirmative action posture to hire applicants, we consider that it might be advisable for the State Police to consider her applica-

tion, knowing that her 30th birthday was approaching.

[Tr. 1–168–69.]

This exchange makes it clear that the plaintiff did not contend that Miss Penn was an explicit victim of sex discrimination. The purpose of the testimony of Miss Penn was to show that despite its paucity of female troopers, the State Police were unwilling to bend or waive the application process to recruit additional women. Adherence to such rules is not discrimination. Indeed, had defendant waived the rules *because* Miss Penn was a woman discrimination might well have been proven.

██ With respect to Miss Ricciardelli, the plaintiff presented no evidence beyond her own suspicion that she was rejected for a reason other than her age, i. e., because of her sex. Defendant argues that even if Miss Ricciardelli's age were not the reason for her rejection, sufficient other reason has been shown by Miss Ricciardelli's own testimony. The Court concurs. There is no evidence that the reasons advanced by the Virginia State Police for their rejection of Miss Ricciardelli are pretexts for sex discrimination. Accordingly, the Court finds that neither Miss Penn nor Miss Ricciardelli was the victim of sex discrimination.

In juxtaposition to this testimony the defendant offered the testimony of Trooper Cheryl Nottingham. Trooper Nottingham was the first woman to be hired as a trooper by the Virginia State Police. She testified that she was not discriminated against in any way on account of her sex either in the application process or in the training process or as a working trooper. Indeed, Trooper Nottingham testified that she was encouraged to apply and become a State Trooper. Miss Nottingham applied for the job of trooper in August of 1976. Her 30th birthday came in October of that year.[5]

Plaintiff points to the alleged failure of the Virginia State Police actively to recruit women as evidence of intentional discrimination. The evidence shows that only 38 women applied for trooper positions with the Virginia State Police from 1973 through 1976. Defendant's Exhibits 110 and 111. This small number of female applicants, plaintiff contends, is the result of the admitted discrimination carried on by the State Police prior to 1973, coupled with the failure of the Virginia State Police to recruit women as a remedial measure.

The evidence shows that virtually all of the recruiting efforts expended by the Virginia State Police have been aimed at recruiting black applicants. While it is true that Trooper Green testified that he has sought to recruit women applicants as well as Black applicants, nevertheless, it is clear that the main thrust of his efforts has been at recruiting blacks. Colonel Slane testified that he hoped to add a female trooper to the recruiting team, but wouldn't be able to do so until a female trooper could graduate and have some experience in the field. Tr. 10–147–48. The Virginia State Police has clearly made a policy decision that the best way to recruit for the kind of people they want is to send a trained and experienced trooper, who is a member of the group they seek to recruit, around to talk to prospective applicants. Thus, the lack of a trained and experienced female trooper in the Virginia State Police has resulted in a lack of recruiting for female applicants.

██ The record shows that the idea of women becoming State troopers is a relatively new one. Colonel Burgess, a police officer of 42 years standing, had never heard of females as troopers prior to 1970. Tr. 7–14. Nevertheless, the Court views the failure of the Virginia State Police after the effective date of the Act actively to recruit female applicants as evidence of sex discrimination against women on the part of the Virginia State Police.

The most telling evidence of sex discrimination, however, is the existence until 1976 of a height and weight requirement for

---

**5.** The Court is advised that there is no longer a Trooper Nottingham with the Virginia State Police, Trooper Nottingham having married a Trooper Petska in June 1978.

trooper applicants for the Virginia State Police. Until July, 1976, an applicant for trooper with the Virginia State Police was required to be at least 5′9″ tall and weigh 156 pounds. Plaintiff's evidence showed that these requirements disqualify more than 98% of all women while disqualifying only about half of all men. Plaintiff's Exhibit No. 16. Defendant's answer to the plaintiff's contention that this shows intentional discrimination against women is that the height and weight requirement was instituted and was in effect for many years prior to 1973. During this period the Virginia State Police admittedly would not consider any woman for employment as a State trooper. Her height or weight was no impediment—only her sex. Thus it is specious to argue that the height and weight requirement was intended to exclude women.

Defendant also defends its height and weight requirement on grounds that the Federal Bureau of Investigation used a height and weight requirement for employing special agents until as late as June of 1975. Defendant does not argue that the FBI is incapable of discriminating against women. Instead, its argument is that the Virginia State Police was mindful that the FBI is an arm of the Attorney General of the United States and it reasonably assumed that the U. S. Department of Justice would not maintain the policy if it were prohibited by law. Defendant maintains that its reliance on the standards set by the FBI is evidence of good faith and the nondiscriminatory purpose of the Virginia State Police.

Recognizing that in years past no woman had indicated an interest in becoming a State trooper (a woman police officer was "unheard of") and that even in recent years it is rare for a woman to be so motivated, the Court cannot lay at the feet of the

Virginia State Police all the blame for the lack of female troopers on its force. However, after the Congress acted in 1973 to bar sex discrimination to recipients of LEAA funds the State Police had a legal duty to remove barriers imposed by it which had the effect of discriminating against female applicants.

■ The defendant had a duty to review its employment practices when it became subject to the Act, and either to modify those practices which resulted in extreme adverse impact to a protected group, such as women, or to seek to justify by empirical evidence the necessity for such standards. The defendant did not remove the height and weight barrier until July 1976 and in this suit it made no effort to justify the retention of the requirement on empirical grounds. The only evidence of the job-relatedness of the height and weight requirement found in the record is the opinions of five members of the Virginia State Police that height and weight are useful in police work. This evidence was not offered to prove job-relatedness but to prove a good faith belief of job-relatedness. There is no evidence that justified a 5′9″ requirement or a 159 pound weight requirement. Such evidence would be necessary to establish the job-relatedness of the standard used by the Virginia State Police.[6] In fact, the only empirical evidence in the record as to the validity of the height and weight requirement is Dr. Edgerton's finding that neither height nor weight of the officers correlated substantially with any criterion of job performance in his 1973 validity study. Defendant's Exhibit 12, p. 96.

■ It was not, of course, the implementation of the height and weight requirement in the pre-Act period when no women were considered, nor even its continued use after the Act when it arguably could be considered a bona fide job-related facially neutral requirement that was illegal.[7] But

6. *See Dothard v. Rawlinson*, 433 U.S. 321, 339–40, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977) (Rehnquist, J., concurring).

7. Even now, according to news reports, the uniformed White House honor guard for the

President imposes a height requirement on men and women alike, thus excluding a disproportionate number of women.

the persistence of the practice well after the enactment without evidence of its enhancement of job performance can only mean that the State Police intended to keep the number of women on its force low. Thus, the Court concludes that from and after the effective date of the Act the defendant purposefully discriminated against women in employment as State troopers.

The foregoing discussion also affirms plaintiff's contention that the height and weight requirement is an illegal employment practice under the disparate impact theory of *Griggs*.

## IV

The plaintiff alleges that the Virginia State Police discriminates on the basis of race in hiring for civilian positions. Plaintiff's case is based almost entirely upon the statistical evidence on the numbers of blacks hired by the defendant compared with the numbers of blacks that would have been hired by the defendant if the defendant had hired blacks in proportion to their representation in the civilian labor force in Virginia.

Plaintiff seeks to prove its case by a statistical analysis involving the use of the standard deviation of a population sample. The argument is that if there were no discrimination practiced by the Virginia State Police the proportion of blacks employed in civilian positions by the Virginia State Police would be roughly equal to the proportion of blacks in the civilian labor force. A slight deviation would not be strong evidence of discrimination. A major deviation would be significant. Therefore, the plaintiff has used the standard deviation analysis to show that the numbers of blacks hired by the Virginia State Police in civilian positions is significantly smaller than the numbers of blacks that would have been hired if blacks had been hired in the same proportion as their representation in the civilian labor force. This analysis has resulted in Table I:

TABLE I
Statistical Analysis of Black Employees
in Civilian Positions with the Virginia
State Police, 1973-76.
(Source: Plaintiff's Exhibit 23D)

| | Total Employed | Blacks Actually Employed | Expected Employed | Difference Between Actual & Expected | Standard Deviation | Number of Standard Deviations Difference |
|---|---|---|---|---|---|---|
| 12/31/73 | 396 | 21 | 68 | 47 | 7.51 | 6.3 |
| 12/31/74 | 412 | 18 | 70 | 52 | 7.66 | 6.8 |
| 12/31/75 | 438 | 22 | 75 | 43 | 7.90 | 5.4 |
| 12/31/76 | 451 | 28 | 77 | 49 | 8.01 | 6.1 |

Table I is derived by first multiplying the total number of persons employed in civilian positions for each of the years 1973 through 1976 by the number .172 which is the proportion of blacks in the civilian labor force in Virginia as of the 1970 census. This calculation results in the "expected employed" statistic—the number of blacks who would have been in the employ of the Virginia State Police had the Virginia State Police employed blacks in proportion to their membership in the civilian labor force. The plaintiff then subtracts the number of blacks actually employed by the Virginia State Police from this figure for expected employees and divides the figure thus obtained by the standard deviation for the population. The number thus obtained is

the number of standard deviations between the number of blacks who would have been employed had the hiring of the Virginia State Police been random, and the number of blacks actually hired. If that number were no more than two or three, then the inference that hiring in the Virginia State Police was unbiased with respect to race would be supported. When, as here, the number is five or more, the inference that hiring in the Virginia State Police for civilian positions is unbiased with respect to race is not supported.

■ This analysis necessarily makes several assumptions. First, it is assumed that the civilian labor force for the entire Commonwealth of Virginia is the labor pool from which the Virginia State Police draws its civilian employees. The evidence shows, however, that the bulk of its civilian employees are located at the State Police Headquarters in Richmond and thus are drawn from the Richmond area. Accordingly, the civilian labor force statistics for the State as a whole are not applicable. Plaintiff's analysis does not take into account the present effects of pre-Act hiring. The analysis further fails to take into account other population characteristics which are not shown to be randomly distributed with regard to race. One such non-random population characteristic may be the distribution of various skills required by the civilian positions offered by the Virginia State Police. Another such characteristic, shown by the evidence to be concentrated among blacks, is an antipathy toward law enforcement as a career. Tr. 9–104. The entire history of black deprivation which has made affirmative action neces-

sary refutes an assumption of even or random distribution of job skills and motivations.

As the Supreme Court has said, "[w]hen special qualifications are required to fill particular jobs, comparison to the general population (rather than to the smaller group of individuals who possess the necessary qualifications) may have little probative value." *Hazelwood*, 433 U.S. at 308, n. 13, 97 S.Ct. at 2742. A review of Plaintiff's Exhibit 22, however, shows that the civilian employees of the Virginia State Police include persons in such positions as accountants, building construction inspectors, clerk stenographers, clerk typists, computer programmers, computer systems analysts, highway equipment mechanics, radio engineers, radio technicians, photographers, and other skilled positions.

■ In the absence₁ of any evidence from plaintiff as to the percentage of blacks holding the indicated skills, or, alternatively, evidence that the skills are commonly held and easily learned, *cf. Hazelwood*, 433 U.S. at 308, n. 13, 97 S.Ct. 2736, the Court simply has no basis for finding that blacks are so underrepresented in the skilled civilian positions that racial discrimination may be inferred.

The Court has attempted to separate out from the civilian job titles found in Plaintiff's Exhibit No. 22B positions that presumably many persons can fill or which can be filled with minimal training. The distribution of black and white employees in these positions is set out in Table II–A. The remainder of the positions are set out in Table II–B.[8]

---

**8.** The Court has found it necessary to interpret some of the abbreviations used for the titles of the positions found in Plaintiff's Exhibit 22B. For instance, the Court has interpreted "Comp. Syst.An." to mean Computer Systems Analyst. Also, the Court has included all supervisory or foreman jobs among the skilled positions, in line with the view taken by the Fourth Circuit in *Patterson v. American Tobacco Co.*, 535 F.2d 257, 274–75 (4th Cir. 1976).

Although the Court believes that the job of police dispatcher requires skills that can be readily obtained by members of the general population, this job is not included among the

unskilled positions because applicants for the position of police dispatcher, unlike applicants for any other civilian position with the Virginia State Police, were required to pass a written test prior to 1976. Thus, while plaintiff's argument with respect to all other civilian positions was based on purposeful or "disparate treatment" discrimination, the argument with respect to the police dispatcher position is based on disparate impact. If the written test as applied to dispatchers were valid, it could theoretically have disqualified all black applicants without violating Title VII.

## TABLE II-A

### Civilian Employees in Unskilled Positions
### as of 31 December 1976
### (Source: Plaintiff's Exhibit 22B)

| | White | Black |
|------------------------|-------------|-----------|
| Clerk D | 6 | – |
| Clerk C | 19 | 1 |
| Clerk B. | 47 | .4 |
| Clerk-Mess. B | 2 | – |
| Comp. Oper. A | 2 | 1 |
| Comp. Oper. B | 2 | – |
| Cook A | – | 2 |
| Corr. Off. | – | 1 |
| Cust. Worker | 5 | 2 |
| Fing. Tech. A. | 3 | 2 |
| Fing. Tech. B | 5 | – |
| Food Serv. Aid A | 1 | 5 |
| Off. Dup. Mac. Op. A | 3 | – |
| Painter | 1 | – |
| PhotoCpy. Eqp. Oper. B | 1 | – |
| Rec. Info. Dispatcher | 1 | – |
| Staff Photo. | 2 | – |
| Stat. A | 1 | 1 |
| Storekeeper Asst. | 1 | – |
| TOTAL (Percent) | 102(84.3) | 19(15.7) |

## TABLE II-B

### Civilian Employees in Skilled Positions
### as of 31 December 1976
### (Source: Plaintiff's Exhibit 22B)

| | White | Black |
|-------------------------|-------|-------|
| Acct. B | 1 | – |
| Acct. A | 1 | – |
| ADP Mgr. A | 1 | – |
| ADP PC Supv. | 1 | – |
| ADP P. Tech A. | 1 | – |
| Bldg. Const. Insp. | 1 | – |
| Bldg. & Gds. Supv. A | 1 | – |
| Cent. Crim. Rec. Asst. Dir. | 1 | – |
| Cent. Crim. Rec. Exc. Dir. | 1 | – |
| Cent. Crim. Rec. Supv. | 1 | – |
| Clerk-Steno D | 15 | – |
| Clerk-Steno C. | 53 | 1. |
| Clerk-Steno B | 10 | – |
| Clerk-Typist C | 22 | – |
| Clerk-Typist B | 48 | – |
| Comp. Oper. Supv. | 1 | – |
| Comp. Prog. B | 2 | – |
| Comp. Prog. A | 3 | 2 |
| Comp. Syst. An. A | 2 | – |
| Comp. Syst. Dev. Supv. | 1 | – |
| Conf. Sec. | 1 | – |
| Data Entry Op. A | 20 | 1 |
| Data Entry Supv. | 1 | – |
| Dict. Unit Supv. A | – | 1 |
| Hwy. Equip. Supv. A | 1 | – |
| Hwy. Equip. Rep. For. A | 1 | – |
| Hwy. Equip. Mech. A | 5 | – |
| Hwy. Equip. Mech. B | 1 | 1 |
| Hsk. Supv. A | – | 1 |
| Info. Dir. A | 1 | – |
| Police Dispatcher | 84 | – |
| Pur. & Stores Supv. B | 1 | – |
| Radio Asst. Eng. | 1 | – |

Civilian Employees in Skilled Positions
as of 31 December 1976
(Source: Plaintiff's Exhibit 22B)

| | White | Black |
|---|---|---|
| Radio Eng. | 1 | -- |
| Radio Mech. | 4 | -- |
| Radio Mech. LD Man. | 1 | -- |
| Radio Tech. B | 7 | -- |
| Radio Tech. A | 19 | 1 |
| Radio Tower Asst. Supv. | 1 | -- |
| Radio Tower Supv. | 1 | -- |
| Soft Wr. Syst. Prog. B | 1 | -- |
| Staff Photo | 2 | -- |
| Storekeeper Fore. | 2 | 1 |
| Storekeeper Supv. C | 1 | -- |
| Storekeeper Supv. A | 7 | -- |
| TOTAL (Percent) | 331(97.4%) | 9(2.6%) |

These tables, the Court recognizes, have very little probative value. There is, for instance, no evidence in the record to support the Court's determination that the jobs found in Table I are those which require skills that many persons possess or may easily acquire. The Court's choice was based entirely on the name of the position as set forth in Exhibit 22B. Nevertheless, it is apparent that the proportion of blacks in those jobs which the Court speculates are those in which comparison with general population statistics is appropriate, is very close to the proportion of blacks in the State civilian labor force according to census data.[9] These figures do not suffice to prove that the Virginia State Police have not discriminated against blacks in hiring for civilian positions. However, it is not the burden of the Virginia State Police to prove that they have not discriminated. It remains the burden of the United States to prove that they have discriminated. *Roman v. ESB, Inc.*, 550 F.2d 1343, 1350 (4th Cir. 1976).

The plaintiff introduced the testimony of only one witness to show that there had been racial discrimination in hiring for civilian positions in the Virginia State Police. Miss Evelyn C. Faison testified that she had taken the civil service test for a clerical position with the State of Virginia and passed it in 1972. She testified that in 1974 she applied for a clerical position with the Virginia State Police. Her application, Defendant's Exhibit 148, shows that she did not list the fact that she had taken and passed a State civil service examination for a clerical position. The work experience listed in her application shows work as a presser in a cleaning establishment, as a utility aide in a paper company, as an elevator operator at the Medical College of Virginia and in the cleaning department of a cleaning establishment. On the basis of her application Miss Faison was offered a food service job at the Virginia State Police Headquarters. The plaintiff argues that this incident shows the method by which blacks were channeled into lower paying clerical and food service positions in the Virginia State Police. In fact, it shows nothing of the kind. The job Miss Faison was offered was commensurate with her abilities as they appeared from her application. Thus, the testimony of Miss Faison is of no value in showing discrimination by the defendant against blacks in hiring for civilian positions.

Plaintiff also argues that the concentration of black civilian employees in food service and custodial positions shows racial discrimination on the part of the Virginia State Police. The evidence shows that of 15 civilian employees in the jobs of cook, food service aide, and custodial worker, six are white and nine are black. However, there is no evidence in the record to

9. However, this figure may not reflect the actual labor market from which the State Police draws its employees. *See* Part V–A, *infra* and p. 1090, *supra*.

show whether this disproportional assignment of black workers to custodial and food service positions is the result of post-Act hiring, or if this pattern is merely a holdover from the time before the effective date of the Act. In the latter case, no liability could be found on the basis of these statistics. *Hazelwood*, 433 U.S. at 309, 97 S.Ct. 2736. The evidence that the Court does have, however, shows that the proportion of blacks in these positions has declined from 77% in 1974 to 60% in 1976. (See Table III). Finally, there is no evidence in the record that food service or custodial jobs are lower paid or less desirable jobs in the Virginia State Police than such jobs as clerks, clerk typists or office duplicating machine operators.

TABLE III

Civilian Employees in Food Service and Custodial
Positions by Race as of 31 December 1974 and as
of 31 December 1976
(Source: Plaintiff's Exhibit 22B)

| | 1974 | | 1976 | |
| | White | Black | White | Black |
| --- | --- | --- | --- | --- |
| Cook A | – | 2 | – | 2 |
| Cust. Worker | 3 | 3 | 5 | 2 |
| Food Svc. Aid A | – | 5 | 1 | 5 |
| TOTAL | 3 | 10 | 6 | 9 |
| Percent | 23.1% | 76.9% | 40.0% | 60.0% |

The Court treats separately the civilian position of police dispatcher. Applicants for the job of police dispatcher with the Virginia State Police were required to take the same written examination taken by applicants for trooper positions. This written examination is discussed in Part IV of this memorandum. The analysis of adverse impact found there applies equally to the test when used to test applicants for dispatcher position. Thus, the test, as will be seen in Part IV, is shown to have an adverse impact upon blacks, and may be used as a selection device only if it has also been shown to be a valid predictor of job performance.

The defendant has not even attempted to show that the written test is in any way related to any criterion of job performance in the job of police dispatcher. Unlike the job of trooper, successful completion of a training program is not a requirement for the job of dispatcher. The evidence shows, it is true, that some dispatchers are sent to the State Police training school, if space permits, to familiarize them more fully with the tasks of the troopers they support. However, it is clear from the evidence that the training school is not a requirement of the job of dispatcher. Thus, the Court finds that it was a violation of § 3766(c) for the Virginia State Police to use the written test as a selection device for applicants for the dispatcher position.

Plaintiff's Exhibit 15 shows that only five black applicants for dispatcher positions failed the State Police written test from 10 May 1973 to 31 December 1975. The record does not show how many of these were failed prior to the effective date of the Act, 1 July 1973. It is clear in any event that the unlawful employment practice found by the Court had a very small impact. Nevertheless, relief must be fashioned to make whole those persons who are the victims of that unlawful employment practice.

V

The Court will now consider the main thrust of plaintiff's case, that the Virginia State Police discriminated against blacks in hiring for trooper positions. Plaintiff seeks to prove its case through five basic modes of proof. First, the plaintiff has offered statistical evidence on the hiring of blacks

by the Virginia State Police compared with the statistics on the proportion of blacks in what is alleged to be the relevant labor market. Second, the plaintiff contends that the use of a written test from the effective date of the Act to December 1975 had an adverse impact upon black applicants and that the test has not been shown to be validated as job-related. Third, the plaintiff contends that the background investigation of trooper applicants was conducted in such a way as to discriminate against black applicants. Fourth, the plaintiff has presented the testimony of several black applicants and conditionally appointed troopers who claim to have been discriminated against in the employment process by the Virginia State Police. Fifth, the plaintiff contends that the minority recruiting program of the Virginia State Police is inadequate, and that the failure of the Virginia State Police to run an adequate minority recruiting program is evidence of discrimination.

A.

■ The race of Virginia State Police sworn personnel on the last day of December 1973 to the last day of December 1976 is shown in Table IV.

TABLE IV
Virginia State Troopers by Race
1973–1976

| Date | Total Employed | White(%) | Black(%) |
|------|---------------|----------|----------|
| 31 December 1973 | 1055 | 1047 (99.2%) | 8 (0.8%) |
| 31 December 1974 | 1096 | 1087 (99.2%) | 9 (0.8%) |
| 31 December 1975 | 1104 | 1093 (99.2%) | 11(1.0%) |
| 31 December 1976 | 1132 | 1101 (97.3%) | 31(2.7%) |

These figures, of course, reflect the results of hiring practices of the Virginia State Police over a period of decades. This Court must necessarily concern itself with the hiring record of the Virginia State Police since the July 1973 effective date of the Act.

The statistics on hiring in the Virginia State Police since 1973 are set out in Table V.

TABLE V

Troopers Hired by the Virginia State Police by Race
1973–1977

| Year | Total Hired | White (%) | Black (%) |
|------|-------------|-----------|-----------|
| 1973* | 91 | 85 (93.4%) | 6 (6.6%) |
| 1974 | 96 | 93 (96.9%) | 3 (3.1%) |
| 1975 | 64 | 62 (96.9%) | 2 (3.1%) |
| 1976 | 86 | 63 (73.3%) | 23(26.7%) |
| 1977 (As of 12 August 1977) | 63 | 52 (82.5%) | 11(17.5%) |
| TOTAL | 400 | 355 (88.75%) | 45 (17.5%) |

\* Hiring figures for 1973 reflect hiring for the entire year, not merely the six months after the effective date of the Act.

The Supreme Court's opinion in *Hazelwood* indicates that there are two comparisons that may be made using the data found in Table V. One is to compare the proportion of blacks hired by the Virginia State Police with the proportion of blacks in the relevant labor market. The other comparison that may be made is to compare the

proportion of blacks hired with the proportion of blacks among those who sought employment with the Virginia State Police.

a.

Before the first comparison can be drawn, however, it is necessary to determine what constitutes the relevant labor market for the position of trooper in the Virginia State Police. Plaintiff contends that the best statistics available for a relevant labor market are the figures from the 1970 census for the civilian labor force aged 21 to 29 in Virginia. Defendant argues, however, that these undifferentiated work force statistics include many persons who could not meet the minimum requirements for the job of State trooper. The defendant offers statistics which purport to include those individuals who at the time of the 1970 census were 21 through 29 years of age, had completed twelve years of education or had a General Education Development (GED) certificate, were not disabled for six months or more, were not in jail or in a long term hospital, and were in the "labor force" as defined by the Bureau of Census. The plaintiff's method of calculating the relevant labor market results in a relevant labor market that is 16.3% black. The defendant's method gives a relevant labor market that is 10.67% black.

The method chosen by the defendant appears to be by far the more relevant. However, the plaintiff raises two objections to defendant's approach. First, the plaintiff argues that the adjustments made by the defendant are made not in an attempt to more closely define the proper labor market but in an attempt to reduce the proportion of blacks in the relevant labor market. Second, the plaintiff argues that the defendant's figures are not up-to-date with respect to the proportion of blacks in the relevant age group and with respect to the proportion of blacks who have achieved the required educational level.

The Court believes that the plaintiff's first objection is not well taken. Despite the view of plaintiff's industrial psycholo-gist that aggregate data should be used even where more precise data is available because there is no agreement among experts as to what adjustments are appropriate, the Supreme Court in *Hazelwood* made it clear that the district court should define the relevant labor market with as much precision as possible. 433 U.S. at 312, 97 S.Ct. 2736. The entire purpose of a comparison between hiring statistics and labor force statistics is to show that the hiring of the defendant is or is not random with respect to race. Unless other non-random factors are first accounted for, this purpose will necessarily be defeated, and the entire analysis will be utterly lacking in probative value. It would be simply a cover for statistically justifying a pre-conceived conclusion.

The plaintiff's second objection is far more valid. Plaintiff presented the testimony of Dr. Larry Suter, Chief of the Education Statistics Branch of the Population Branch of the Bureau of the Census, to show that certain population trends since 1970 have resulted in an increase in the proportion of blacks in the defendant's defined relevant labor force. Dr. Suter testified that the proportion of blacks in the 21–29 year old age group has increased in Virginia since the latest decennial census. He also testified that the proportion of blacks meeting the minimum educational standards of the Virginia State Police has increased in Virginia since 1970. Dr. Suter suggested increasing the proportion of blacks in the eligible labor force as defined by the defendants from 10.67% to either 12.47% or 15.47% in 1977. Tr. p. 11–13.

Dr. Suter testified that his analysis of the increase in black educational attainment since 1970 would indicate that the eligible labor force for the Virginia State Police as defined in Defendant's Exhibit 119 should be increased by perhaps 1.8% or even by as much as 4.8% because of the increase in the proportion of blacks in the 20–29 age group and the increase in the proportion of blacks who are high school graduates. The 1.8% figure comes from Dr. Suter's analysis of

the current population survey for the nation as a whole. Tr. p. 11–11. The 4.8% figure is derived from the Virginia segment of the national current population survey, but Dr. Suter was reluctant to put great confidence in the Virginia figure because the current population survey was based on an intended national sample, not a sample reflective of the population of Virginia. The Virginia sample is so small that the standard error of the sample is relatively high. In addition, Dr. Suter's analysis is limited to persons not in the armed forces, a fertile recruiting ground for the State Police. Also, Dr. Suter's competence in the field of determining relevant labor markets was not conceded by defendant nor, indeed, was it claimed by Dr. Suter. Tr. 11–5. Finally, Dr. Suter's testimony was not claimed to be and was not presented by the plaintiff in an effort to prove the proportion of blacks in the eligible labor force. It was instead presented on rebuttal to show that the figures in Defendant's Exhibit 119 should not be accepted by the Court as an accurate portrayal of the eligible labor force because the figures are now eight years old and change has taken place. Dr. Suter's testimony clearly supports this objection. The plaintiff argues that defendant's calculations based on the 1970 census are incorrect because they are out-of-date. Unfortunately for the Court, the same argument applies with equal force to plaintiff's statistics.

The purpose of establishing the relevant labor market of trooper applicants to the Virginia State Police is to raise an inference, by comparison of that figure with the number of blacks actually hired, that the Virginia State Police discriminated against blacks in hiring. Thus, the burden of proving the relevant labor market rests squarely upon the plaintiff in this case. The foregoing discussion makes it clear that the plaintiff has not carried its burden. Neither party has offered the testimony of an ex-

pert in demography or of a witness qualified by his experience or training to testify as to the racial breakdown of the relevant labor market for a trooper in the Virginia State Police for any period covered by this law suit. Plaintiff protests that other courts in similar cases have used the aggregate, undifferentiated census figures it offered in this case. If this be true it still is not justification in this Court's view for imposing liability upon a defendant on the basis of unreliable or missing evidence. This case has been pending since December 1976. The United States does not lack the resources to develop the proof necessary to show the relevant labor market. The reliance upon unanalyzed data copied from the 1970 census, even coupled with Dr. Suter's projections, cannot replace reliable proof in an important case such as this.

In *Hazelwood,* the district court failed to make a finding of fact on the relevant labor market for teachers in the St. Louis area. The court ruled no discrimination upon a finding that the proportion of black teachers was roughly equal to the proportion of black pupils in the school district. The Supreme Court disapproved of this comparison, but also disapproved of the action of the court of appeals in accepting the plaintiff's argument that the relevant labor market should be determined by including teachers from the entire St. Louis metropolitan area. The Supreme Court remanded the case to the district court for a precise finding on the actual relevant labor market of qualified teachers in the area from which applicants were drawn. In the present case, unlike *Hazelwood,* the plaintiff has failed to introduce evidence sufficient for a finding of the relevant labor market. Under these circumstances, no comparisons can validly be drawn and the standard deviation data offered by plaintiff in reliance upon *Castaneda v. Partida,* 430 U.S. 482, 496–97, n. 17, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), is meaningless.[10]

10. In *Hazelwood* the Supreme Court specifically provided that on remand the defendant should be permitted to re-open its case to try to show by means of applicant-flow data that it had not discriminated against blacks in hiring. Justice Stevens, in dissent, objected strenuous-

ly to this practice on grounds of judicial economy, criticizing the Court's action in remanding the case as a departure from well-established rules of procedure. Justice Brennan, concurring, indicated that only the fact that the district court had misapplied the governing legal

b.

Even if the relevant labor market were, as plaintiff contends, 16.3% black, the *Castaneda* analysis would not support a finding of racial discrimination. First, the Court considers it inappropriate to apply the *Castaneda* analysis to the statistics for the total sworn work force of the Virginia State Police. Because only such discrimination as took place after the effective date of the Act may be considered in making a finding of liability in this case, only the hiring behavior of the defendant since 1 July 1973 is relevant to the question of liability. Thus, the proper statistics to which the *Castaneda* analysis may be applied are the figures for troopers hired from 1973 to 1977. More precisely the proper statistics to use in this analysis would be the statistics showing the racial makeup of persons *offered* employment with the Virginia State Police in sworn positions after 1 July 1973. The Virginia State Police has no power to conscript persons into its work force. If 16.3% of those persons offered employment in sworn positions by the Virginia State Police were black, the plaintiff's argument would fail even if no blacks accepted the offer from the State Police (assuming nothing more were shown). Thus, the fact that the plaintiff uses only hiring statistics necessarily requires the Court to assume, in order to find liability on the basis of those statistics, that the applicants from both races accepted employment when offered at the same rate. Nothing in the record will support this assumption, and this fact makes the Court uneasy about using plaintiff's *Castaneda* analysis to impose liability upon the defendant. In any case, the plaintiff's *Castaneda* analysis is set out in Table VI.

TABLE VI

Statistical Analysis of Black Employees
in Trooper Positions with the Virginia State Police
1973-77
(Source: Plaintiff's Exhibit 21B)

| | Total Employed | Blacks Actually Hired | Blacks Expected Hired | Difference Between Actual & Expected | Standard Deviation | Number of Standard Deviations Difference |
|---|---|---|---|---|---|---|
| 1973 | 91 | 6 | 14.8 | -8.8 | 3.52 | -2.5 |
| 1974 | 96 | 3 | 15.6 | -12.6 | 3.62 | -3.5 |
| 1975 | 64 | 2 | 10.4 | -8.4 | 2.95 | -2.8 |
| 1976 | 86 | 23 | 14.0 | +9.0 | 3.42 | +2.6 |
| 1977 | 63 | 11 | 10.3 | +0.7 | 2.93 | +0.2 |

principles justified the Supreme Court's action in permitting the evidence to be re-opened. Justice White, concurring, suggested that the United States should have been required to adduce evidence as to the applicant-flow as part of its *prima facie* case.

This Court has considered re-opening the evidence in this case to permit the parties to submit satisfactory evidence on both the relevant labor market and the applicant-flow questions in the light of the Supreme Court's action in *Hazelwood.* However, the Court is convinced that such action would be unwarranted and improper. The Supreme Court's action in *Hazelwood* was clearly motivated by a desire to prevent possible injustice arising out of the district court's erroneous comparison of work-force data with pupil enrollment data. This comparison resulted in a finding for the defendant at the trial level in *Hazelwood.* The Supreme Court apparently felt that the lower court's view of the law may have persuaded the defendant that applicant-flow data was not necessary or even relevant to its case. This Court is under no such misapprehension and therefore has determined to follow the ancient and well-established rule of procedure regarding the presentation of evidence. Both parties having been given adequate time to prepare for trial, there having been no restriction upon the presentation of the population data, and both parties having rested their respective cases, the parties are entitled to a decision on the record made. To do otherwise would convert a trial into a yo-yo—sending it back for another twirl whenever a lapse in the proof appeared.

Table VI shows that the difference between the number of black troopers actually hired and the number of black troopers that would have been hired if the defendant had hired blacks in proportion to their numbers in the civilian labor force was significant in 1973, 1974 and 1975. In each case, the difference between the number actually hired and the number expected to be hired was more than two standard deviations from the mean. However, the numbers involved are very small. For example, if in 1973 the Virginia State Police had hired two more blacks than they actually hired, 8 instead of 6, the difference between the actual number hired and the expected hired would have been only 6.8, less than 2 standard deviations difference. Furthermore, in 1976 the defendant hired many more blacks than the plaintiff's formula would have expected it to hire. In 1977, the defendant hired almost exactly the number that plaintiff's formula expected it to hire.

The Court does not believe that it is a coincidence that defendant's statistics on hiring of blacks should change so dramatically at the same time that the defendant abolished its written test, that is, the end of 1975. Thus, the Court believes that the low numbers of blacks hired prior to 1976, far from being the telltale sign of intentional discrimination, is in fact, the unintentional (and apparently undesired) result of defendant's use of a written test as a selection device.

It should be noted that if the defendant's 10.67% figure be used then the hiring practices during the overall post-Act period are proportionate to random hiring in the designated population and no inference of discrimination arises. As will be shown hereafter, the Virginia State Police force is not composed of persons randomly hired. The hiring of State troopers is a highly selective process.[11]

c.

The other comparison which may be made is a comparison between the hiring of blacks and the applicant flow of blacks. If the proportion of blacks offered employment by the defendant is significantly smaller than the proportion of blacks among applicants, then the inference that the defendant is discriminating against blacks with respect to hiring for trooper positions is supported. If, on the other hand, the proportions are roughly equal, the position of the plaintiff that the defendant discriminates against blacks in hiring is not supported.

In making this analysis, the Court is faced immediately with two serious problems in the evidence presented by the plaintiff. First, the applicant statistics introduced by the plaintiff in Plaintiff's Exhibit 34 are, for the years 1974, 1975, and 1976, not broken down between applications received for civilian positions and applications received for trooper positions. Tr. 2–21–AM. The second problem is that in any given year the persons listed in Plaintiff's Exhibit 34B are not necessarily the same persons who applied during that particular year, but may include persons who applied during an earlier year. Thus, year-by-year comparisons are impossible.

Taken as a whole, however, the applicant-flow data available shows that from 1973 through 1976 10.8% of all applicants for both civilian and sworn positions were black. Plaintiff's Exhibit 34A. Table VI shows that over the same period 34 of 337 or 10.1% of all troopers hired were black. Thus, the analysis of such applicant-flow data as is available to the Court fails to reveal any evidence of a pattern or practice of discrimination.

The Court notes that in 1973, 1974 and 1975 the proportion of blacks hired as troopers was much lower than the proportion of blacks hired in 1976 and 1977. Although, as has been shown, year-by-year comparisons of applicant flow data and hiring data are difficult or impossible to draw and the proper comparison in any case is between the number of applicants and the number of persons *offered* employment with the Virginia State Police, the Court nevertheless recognizes that the relatively low number of blacks hired may be a telltale sign of discrimination in the early years immediately following the effective date of the Act.

11. See, n. 2, *supra*.

The plaintiff has attempted to attribute the increased hiring of blacks in 1976 and 1977 to a combination of the pressure put on the defendant by the Justice Department in the negotiations that preceded the filing of this lawsuit and the desire of Dr. Phillip Ash for a sample of at least 20 black troopers for his differential validity study. Defendant did not display evidence of bending to threats or pressure from the Justice Department. It was because defendant refused to bend that the suit was instituted. The Court believes that the abolition in 1976 of the written test used by the Virginia State Police was the factor which led to the sharp increase in hiring of blacks. This test had a substantial adverse impact on blacks and its abolition coincided with a sharp increase in the hiring of blacks. Further, by the middle of the 1970's the minority recruiting program commenced in 1973 had begun to have favorable effects.

## B.

From the effective date of the Act until December 1975 the Virginia State Police administered a written test to all applicants for trooper positions consisting of a battery of three tests: the Army Alpha Test, the Otis Test of Intelligence, and the O'Rouke Test of Mechanical Aptitude. Plaintiff's Exhibit 11. The defendant does not dispute plaintiff's contention that this test had a severe adverse impact upon blacks. (See Table VII). Thus, under *Griggs*, the burden of proof passed to the defendant to show that the test was valid.

TABLE VII

Results of Written Aptitude Tests for Trooper and
Dispatcher Positions by Race, 1973-1975
(Source: Plaintiff's Exhibit 15)

Whites

| | | Total Taking Exam | Total Passing | Pass Rate |
|---|---|---|---|---|
| 1973 | Trooper | 194 | 147 | 75.8% |
| | Dispatcher | 31 | 24 | 77.4% |
| 1974 | Trooper | 335 | 247 | 73.7% |
| | Dispatcher | 53 | 34 | 64.2% |
| 1975 | Trooper | 126 | 101 | 80.2% |
| | Dispatcher | 62 | 46 | 74.2% |
| TOTAL | Trooper | 655 | 495 | 75.6% |
| | Dispatcher | 146 | 104 | 71.2% |
| | TOTAL: | 801 | 599 | 74.8% |

Blacks

| | | Total Taking Exam | Total Passing | Pass Rate |
|---|---|---|---|---|
| 1973 | Trooper | 37 | 12 | 32.4% |
| | Dispatcher | 2 | 1 | 50.0% |
| 1974 | Trooper | 87 | 28 | 32.2% |
| | Dispatcher | 4 | 1 | 25.0% |
| 1975 | Trooper | 21 | 4 | 19.0% |
| | Dispatcher | 2 | 1 | 50.0% |
| TOTAL | Trooper | 145 | 44 | 30.3% |
| | Dispatcher | 8 | 3 | 37.5% |
| | TOTAL: | 153 | 47 | 30.7% |

The pass rate for black applicants is equal
to 41.0% of the pass rate for whites.

It is clear that the test has not been shown to be a valid predictor of on-the-job performance. The validity study conducted by Dr. Harold A. Edgerton in 1973 did not prove any substantial correlation between performance on the written test and any measure of job performance. The defendant argues that the test is nevertheless valid because performance on the test is significantly related to training school performance. Dr. Edgerton's study showed that the test score had a significant correlation with two measures of school achievement, school grades and class standing. Of course, one's class standing is a closely related function of his school grades, so these two measures may be considered, in reality, one. Nevertheless, the testimony shows that each of these correlations was both statistically and practically significant. In other words, one who did well on the entrance test could be expected to do well in school.[12]

In *Washington v. Davis,* 426 U.S. 229, 249–52, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) the Supreme Court considered the question of whether validation of a selection test against training school performance was sufficient under the standard in *Griggs* and *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). The Court held squarely that a written test may be validated against training school performance alone even in the absence of evidence that performance in the training program is related to the actual performance of the job. In the instant case, the evidence shows that the successful completion of the training program is a requirement for the job of trooper, that the training school entails approximately 1,000 hours of study over a period of more than twenty weeks, that the cost of training a new trooper is somewhere between $19,000 and $20,000, and that the attrition rate in the training school has increased sharply since the written test was dropped in 1975. Tr. 9–142–146. Under these circumstances, the Court believes that it is sufficient for the defendant to show that the written test was a valid predictor of training school performance in order to sustain its burden of proof under *Griggs* as interpreted by *Washington v. Davis.*

Plaintiff presents the testimony of Dr. James J. Kirkpatrick in an attempt to show that the validity study relied upon by the defendant was not conducted in accordance with federal and professional standards for such studies. The substance of Dr. Kirkpatrick's objection to the study is that it did not test for differential validity. It is obvious that a differential validity test was technically infeasible at the time Dr. Edgerton conducted his study in 1973. There simply were not enough blacks on the force at that time to conduct such a study. Dr. Kirkpatrick, on cross-examination, admitted this but nevertheless insisted that the study was flawed. Such insistence was of a piece with Dr. Kirkpatrick's approach to the issues in this lawsuit.[13]

---

12. The evidence showed and the Court finds that the study conducted by Dr. Harold Edgerton in 1973 revealed that correlation between the written test used by the Virginia State Police and an applicant's training school grade was 0.55, with statistical significance at the 0.001 level. The evidence showed and the Court finds that the Edgerton study revealed that the correlation between the written test and an applicant's rank in his training school class was 0.42, with statistical significance at the 0.001 level. The evidence also showed that Dr. Edgerton is an experienced and distinguished industrial psychologist, and the Court has reviewed his report and has confidence in his findings.

13. This Court does not believe Dr. Kirkpatrick testified as a disinterested expert. His every aspect, demeanor, expression, inflection and response was characterized by partisanship for the side which had hired him, the plaintiff. In areas where his grasp of the subject matter was extremely suspect, he plunged ahead with opinions and views where he thought his side would benefit. Whenever his excess of zeal would lead him into a trap of his own making, his efforts to lurch free were almost palpable. In over twenty years at the bench and bar, this judge has seen only two other "experts" in the mold of Dr. Kirkpatrick. Of them it could be said that their testimony was disinterested and their opinions sincere only insofar as they coincided with the purposes of their client.

It would probably be improper to say that Dr. Kirkpatrick's lack of objectivity is a result of his expert witness' fee. It is, most likely

The defendant presented the testimony of Dr. Phillip Ash, an industrial psychologist who is presently engaged in designing a new test battery for the Virginia State Police. Dr. Ash conducted a re-analysis of the data gathered by Dr. Edgerton in 1973. Dr. Ash testified on the basis of his analysis of Dr. Edgerton's data that the written test was a valid predictor of training school performance. Tr. 9–202. Dr. Ash also testified that Dr. Edgerton "could have written a much more forceful summary of positive results than he did." Tr. 10–60.

The Court found Dr. Ash's testimony wholly satisfactory. His impartiality and professional attitude was apparent from his demeanor and responses. The Court accepts Dr. Ash's views on the validity of the written test as correct, and rejects the views to the contrary which Dr. Kirkpatrick professed to hold.

Although such regulations as the EEOC Guidelines on Employee Selection Procedures and the Department of Justice Guidelines are entitled to great weight, the validity of a test does not rise or fall solely on the basis of whether the test and the validity study concerning that test meet the Guidelines. Validity is determined by the capacity of a given test to predict job performance. This is a question of fact, and in making this determination the trier of fact must depend heavily upon the opinions of experts in the field. In this case, the Court has the benefit of the views of three experts, Drs. Edgerton, Ash, and Kirkpatrick. Two of these three, after reviewing the criteria, the Guidelines and the statistical evidence, say that the written test used by the Virginia State Police is a valid predictor of training school performance. The third, Dr. Kirkpatrick, says that the test is not valid. The view of Drs. Edgerton and Ash is supported by the statistical proof, and buttressed by Dr. Ash's experience, competence and objectivity. The Court finds on the basis of this evidence that the written

test used by the Virginia State Police was, in fact, a valid predictor of training school performance. Thus, under the rule in *Washington v. Davis,* its use by the Virginia State Police was not an unlawful or discriminatory employment practice.

Plaintiff contends that even if the test is valid the cut-off score was placed too high by the Virginia State Police. In order to be eligible for employment, an applicant had to achieve a score of 75 on each of the three written tests by the Virginia State Police. The plaintiff argues that this cut-off score could have been placed much lower and still have been suitable for the defendant's purpose to select those applicants who were capable of passing the training school program.

Defendant apparently agrees that there are some applicants who could pass the training school program even though they received a score on the written test of less than 75. Defendant argues, however, that a lower cut-off score would result in a larger number of "false positives"—persons who pass the written test but are incapable of passing the training school. Tr. 10–80.

The Court believes that the investment necessary to train a State trooper is great enough to justify a cut-off score which would minimize the number of "false positives" and thus save the people of the Commonwealth a substantial sum of money. The Court further believes that such a decision is within the sound discretion of the Virginia State Police. The Department of Justice may believe that a lower cut-off score would have been more appropriate and it may use lower scores in areas it administers, but that is not sufficient to impose liability upon the defendant in this law suit.

The Court recognizes that the testimony showed that when the entrance test was in use very few persons failed the training school because of low grades, that trainees

based upon his zeal for the enforcement of the Equal Employment Opportunity provision of the Civil Rights Act. But just as a physician's zeal for a healthy body should not blind him to

adverse physical conditions, so also should the zeal of the expert in the employment discrimination field for civil rights not render him incapable of giving an unbiased opinion.

who received low passing grades in the training school may perform well as troopers, and that training school grades are of little utility after a trooper has completed the training school. These things are all factors which the Superintendent of the Virginia State Police should have taken into account in deciding the proper cut-off score for the written test. They do not, however, prove that the written test was used by the State Police as a subterfuge for the purpose of excluding blacks.

 In summary the Court finds that the defendant has carried its burden to show that the use of the written test was justified by a valid governmental purpose, in that the written test was a valid predictor of training school performance. The plaintiff, on the other hand, has not proven that the use of the written test, although valid, was in fact a subterfuge for racial discrimination.

### C.

 The plaintiff challenges the defendant's use of background investigations as part of its selection process for new troopers. Plaintiff's challenge has two parts: First, the plaintiff argues that the background investigation shows an adverse impact on black applicants. Second, the plaintiff claims that in certain particulars the background investigation was applied in a disparate manner so as to discriminate against blacks.

### a.

Plaintiff's disparate impact analysis rests upon two objections. First, the plaintiff contends that the background investigation had the result of weeding out a disproportionate number of black applicants, and second, the result was achieved through the purposeful use of credit ratings, cohabitation, venereal disease, and illegitimacy as factors in the background selection process.

The plaintiff's first attack on the background investigation is based on highly questionable statistics. The plaintiff has chosen to provide the Court with full statistics for black applicants, but has not chosen to provide the Court with the statistics for white applicants, without which no meaningful comparison—indeed, no comparison at all—is possible. The Court was able, with some difficulty, to extract from Mr. Stanley Lechner, the witness for the plaintiff who testified on the meaning and preparation of plaintiff's exhibits, a "conservative" estimate of the white selection rate based on the background investigation. The result of the Court's inquiry, sketchy though they are, are recorded in Table VIII.

TABLE VIII

Results of Background Investigation on Trooper
Applicants who passed written test
May 1973 - December 1975

| | White | Black |
|---|---|---|
| Total Passing Exam: | 495 | 44 |
| Total Investigated: | 406* | 33 |
| Number Offered Employment: | 186* | 10 |
| Number Hired: | 176 | 8 |
| % of those investigated either hired or offered employment: | 45.8 | 30.3 |

Black rate as a % of White rate - 66%

* Estimated by Mr. Stanley Lechner. Transcript, pp. 2-83-PM-2-86-PM.

Table VIII is questionable for two reasons. First, the estimates made by Mr. Lechner were made on the basis of his examination of a sample of 247 of these applications. His testimony shows that his sample consisted of the set of applications from the year 1974. Tr. 2–91–PM. Although Mr. Lechner was satisfied with this sampling the device, the Court is not. In view of the other statistical changes there is no reason to believe that 1974 was a typical year, a fact which in the Court's eyes is far more significant than Mr. Lechner's observation that there is no reason to believe that there is any difference between what happened in different years.

Second, the sample of blacks involved in Table VIII is relatively small. If only two more blacks had been offered employment in this period, the selection rate for blacks would have been 80% of the selection rate for whites, and so this selection rate would not have been evidence of adverse impact under the Federal Agency Guidelines.

Further, the evidence shows that during the period represented by Table VIII the Virginia State Police was engaged in a substantial recruitment effort which had as its purpose increasing the number of black applicants for trooper positions. The Court does not believe that applicants whose applications are the result of defendant's recruiting efforts can properly be compared directly with applicants who submitted their application on their own volition. In addition, the period covered by Table VIII is only from May 1973 through 1975. The evidence shows that since 1975 the abolition of the written test has resulted in a sharp increase in the number of black applicants who have received a background investigation. Plaintiff's Exhibit 60. However, the plaintiff has not introduced evidence which would permit the Court to make a comparison between the selection rate of blacks who were investigated since 1975 with the selection rate for white applicants investigated since 1975. The Court cannot find on the basis of this conjectural and incomplete evidence that the use of the background investigation as a selection device by the Virginia State Police has had an adverse impact upon black applicants.

The plaintiffs contend, however, that the use of certain information gathered in the background investigation has an adverse impact upon blacks. Plaintiff does not contend that the factors in question are inappropriate for inquiry. It argues only that the manner in which the information was used discriminates against blacks. Plaintiff examined the file of three by five cards prepared by the State Police personnel officer from 1974 to 1977 showing the notes of the personnel officer on points he considered of interest to be discussed with the superintendent prior to the superintendent's decision on an application. The plaintiff's argument is that since certain factors showed up more frequently on the background investigation of black trooper applicants than they did on the investigation of white trooper applicants, the use of those factors in the employment process by the defendant constituted an unlawful employment practice unless the defendant could come forward with proof that the factors were somehow predictive of job performance.

The Court sees no merit in the plaintiff's argument. First, the Court notes that the plaintiff apparently compared the cards of rejected black applicants with those of rejected white applicants. Thus, only those who failed to pass the background investigation are included in the plaintiff's sample. There is no showing that the factors studied by the plaintiff are in fact the cause of a differential selection rate between blacks and whites. In fact, as noted above, no such differential selection rate has been proven in this case. The Court believes that it is perfectly reasonable for the defendant to take note as part of a comprehensive background investigation of prospective State troopers that any given applicant had a bad credit record, was living with another person out of wedlock, had venereal disease or any other disease, communicable or non-communicable, or had an illegitimate child or illegitimate children. The fact that consideration of these factors

may weigh more heavily against black applicants than against white applicants (a fact not proven by the evidence in this case) does not by itself invalidate these questions as unlawful and discriminatory practices.[14]

The evidence shows that no specific weight is given to any one factor in a person's background when he is considered for a position in the Virginia State Police. The plaintiff argues that this, in itself, is evidence of discrimination—that "standardless discretion" in the hands of the superintendent of the Virginia State Police is itself a violation of Title VII. If this came to be the law, it would mean that job selection even for sensitive and responsible positions such as State trooper must be performed exclusively by a computer or a dullard. Only "yes-no" data could be considered by those making employment decisions, and this data could easily be punched onto a card and inserted into a computer. The critical factor of human judgment, the informed judgment of one whose training and responsibility uniquely fits him for this decision-making role, would be irretrievably lost to the great detriment of all concerned.

b.

The plaintiff's most serious challenge to the defendant's background investigation procedure involves the claim that the background investigation was conducted in such a way as to discriminate against black applicants who were investigated. This is a disparate treatment claim, and, unlike the disparate impact claims discussed above, involves a showing of discriminatory intent. The method plaintiff has chosen to use in showing disparate treatment of black applicants subjected to background investigation

is to compare the background investigation of white applicants who were offered positions in the Virginia State Police with those of black applicants who were rejected.

Plaintiff begins the comparison by showing that three white applicants who were hired had failed to list traffic convictions or certain previous jobs in their applications. The superintendent, Colonel Burgess, said that any such falsifications were adverse factors in a decision to hire an applicant. The white applicant in Plaintiff's Exhibit 1–8 did not list a conviction for speeding on his application. Page 6 of his background investigation shows that this conviction was a six year old speeding ticket from the Park Police at the Petersburg Battlefield Park which did not appear on the Division of Motor Vehicles report which the applicant had sought and obtained. This background investigation shows outstanding recommendations from all employers for honesty and an excellent credit record entirely without blemish and frequently reflecting payments in advance of the due date.

The white applicant in Plaintiff's Exhibit 1–4 did not list two schools and three jobs on his background investigation. The two schools were a Base Extension of Troy State College, Montgomery, Alabama, where the applicant took some courses while he was in the Air Force, and Virginia Western Community College, which plaintiff attended in the Summer of 1971. The jobs were a summer job with the Virginia Department of Highways which the applicant held in high school (1966 or before) a job which the applicant took immediately after high school and held for two weeks in 1967, and a job that the applicant held for one month after leaving the Air Force.

14. At the final pretrial conference in this case, the Court, counsel for plaintiff, and counsel for defendant engaged in a lengthy colloquy concerning plaintiff's challenge to defendant's background investigation. At the end of this colloquy, counsel for plaintiff agreed that it was appropriate for the defendant to gather information on the four factors mentioned above. Tr. of final pretrial conference, p. 153–156. At that time, the Court believed that it was clear to all parties that the plaintiff's complaint revolved around the allegation that the

Virginia State Police were taking legitimately and properly obtained information and using it in such a way as to discriminate against blacks. Apparently, the plaintiff did not share this understanding. The Court cannot see how this could be, but it is clear that plaintiff's disparate impact analysis regarding the background investigation is inconsistent with the understanding reached at the final pretrial conference. Nevertheless, the Court has considered the merits of plaintiff's argument and found it meritless.

This applicant also had a credit record entirely without blemish, and was recommended by a sheriff and two Virginia State troopers. Further, this applicant had worked as an air policeman in the Air Force.

The white applicant in Plaintiff's Exhibit 1-1 lied to the investigator concerning working for his father-in-law to cover up for living with the daughter of his employer prior to their marriage. The investigation shows a good credit rating for this applicant and uniformly good recommendations.

The background investigation reports of the white applicants, as compared with the rejected black applicants, show considerable concern on the part of the Virginia State Police for the veracity of white applicants for trooper positions. It is clear that questions of veracity were fully explored and were either explained to the satisfaction of the investigator or were overcome by the positive factors in the applicant's background. The evidence does not justify an inference that veracity is more severely judged for black applicants.

The plaintiff charges that while certain black applicants were rejected in part because of bad credit, one white applicant with bad credit was hired. If it be shown the black applicants generally had the same negative factors as the white applicant, and no less positive factors, then the Court would consider this evidence of discrimination.

The black applicant in Plaintiff's Exhibit 2-4 is one of those pointed out by plaintiff as having been rejected in part for bad credit. The background investigation reveals four credit transactions all with a history of late payment, and one judgment rendered against the applicant. The background investigation also shows two convictions for defective equipment, one conviction for improper driving, and three convictions for speeding. This applicant also purchased luxury items before paying prior commitments, a factor which Colonel Burgess found significant. Tr. 7-68.

The applicant in Plaintiff's Exhibit 2-5 is another black applicant who had bad credit. This applicant also had a bad academic record, having failed English in the eleventh grade. His civilian employer did not know how this applicant could handle the paperwork for trooper. The applicant had three speeding convictions on his record. The applicant had earned $13,000 in the previous year and would have had to take a pay cut in order to be a trooper. Also, this applicant indicated in his interview that he disliked about his current job things which are also factors in a job as State trooper—long hours, no overtime pay, no union.

The black applicant in Plaintiff's Exhibit 2-11 was also rejected in part because of bad credit. This applicant did not list on his application one part-time job, which he had left without notice. His supervisor on this part-time job gave him a bad recommendation. The applicant had been convicted of reckless driving and of speeding. He claimed that one of his bad accounts was caused by a family member opening an account in his name while the applicant was in Viet Nam. But according to the investigator, the date of the applicant's service in Viet Nam and the opening of the account did not bear out this claim. The applicant also claimed that the speeding ticket was caused by his speeding home on the day his father died, but the relevant dates determined by the investigator failed to support this claim as well. The applicant had an overdue loan at his credit union which was overlooked by plaintiff in its brief at footnote 12, page 28. Further, this applicant's wife thought that a trooper's job was too dangerous.

These three cases are to be compared on plaintiff's suggestion with the white applicant in Plaintiff's Exhibit 1-9. This applicant had a very poor academic record and failed to list several jobs on his application. The applicant had two speeding convictions. He explained his poor credit rating by relating that money he sent home while he was in the army was not used to pay bills. The investigator apparently believed this expla-

nation but the applicant was denied employment. He then went to see Colonel Burgess personally and as a direct result of this personal interview he was hired. Colonel Burgess admitted that he gave this applicant the benefit of the doubt and that it might have been a mistake to have done so since the applicant did not stay with the Virginia State Police very long. Tr. 8–46–8.

The Court cannot find that the white applicant in Plaintiff's Exhibit 1–9 had as bad a record, apart from his bad credit rating, as the black applicants with whom he is asked to be compared. The Court notes that with respect to the background investigation, including adverse recommendations, the applicants were all treated exactly the same up to the point at which the applicant in Plaintiff's Exhibit 1–9 on his own initiative obtained a personal interview with Colonel Burgess. There is no evidence that any applicant was ever denied an interview with Colonel Burgess on account of race. Indeed, a black applicant who testified at trial, Charles White, testified that he had been accorded an interview with Colonel Burgess. Tr. 1–152.

Plaintiff asks that the black applicant in Plaintiff's Exhibit 2–3 be contrasted with the white applicant in Plaintiff's Exhibit 1–10. Colonel Burgess testified that the fact that the black applicant in Plaintiff's Exhibit 2–3 had a bad temper was a factor in his rejection of that applicant. The background investigation revealed that this applicant left a job in 1968 without notice. It revealed that the applicant was divorced and his former wife said that he didn't adequately support their child. The applicant's reference at the Norfolk Naval Shipyard gave the applicant a bad recommendation. On the other hand, the applicant's credit rating was good. He had one speeding conviction. The investigator reported that the applicant appeared tense at his interview and did not appear to really want the State Police job. The investigation revealed that the applicant had been shot in a fight at a crap game. The applicant said that he paid food and clothing for his child

and he took the child as a dependent on his federal income tax. The plaintiff says that there is no mention or indication of bad temper except the investigator's undocumented conclusion. The evidence of the temper was found by the investigator in the involvement of the applicant in a fight during a crap game and in his becoming upset on his job at the Newport News ShipBuilding and DryDock Company.

The white applicant in Plaintiff's Exhibit 1–10 also was reported to have a temper. This applicant had quit a job at Uniroyal without proper notice but was still recommended by them because although he quit without a full two week notice, he did give sufficient notice for their purposes. Three persons interviewed had the following to say about the applicant: "Shows a little temper but controls it;" "Has a little temper but only exhibits it at ballgames, never got into any trouble over it." This applicant was recommended by a Virginia State Trooper, and had a credit record entirely without blemish. The applicant had some traffic violations on his record, but said that he had changed his driving habits considerably and this was apparently accepted by the investigator. The file reveals a letter of recommendation from a trooper brother-in-law of the applicant. The Court does not believe that these two applicants are equally worthy of hire. Accordingly, the failure of the defendant to hire the black applicant and the act of the defendant in hiring the white applicant cannot be said to be evidence of racial discrimination.

The plaintiff also argues that some white applicants are hired with four or five unfavorable factors, pointing to the applicants in Plaintiff's Exhibit 1–4 and 1–5, while blacks with so many unfavorable factors are denied employment. The applicant in Plaintiff's Exhibit 1–4 is discussed above. The applicant in Plaintiff's Exhibit 1–5 is described by plaintiff in brief as having had a bad high school record, his wife being very opposed to his taking the job, and some interviews included questions about his maturity and attitude. However, this applicant's credit record was very good, and

his only speeding conviction was six years old at the time of the investigation. It is true that the applicant's wife expressed some concern about the prospect of separation from the applicant during training, but she does not say that she is "very opposed to his taking the job" although the investigator does say that he thinks that if the applicant's wife prevails, he will not accept the position. This applicant was hired but quit during training. The plaintiff asserts that "[n]othing in the black applicant's files, rejected and accepted, from 1973 through 1977 indicates that a black applicant that made this kind of showing would ever have been hired as a trooper." The fact that this applicant quit during training tends to prove that his hiring was a mistake. The defendant cannot be expected to conduct error-free hiring proceedings. The fact that this isolated mistake was made on a white person's application is not in itself evidence of racial discrimination. Further, the bare assertion by plaintiff, unsupported by an analysis of all black applicants' files cannot be accepted as proven.[15]

Plaintiff suggests that the rejected black applicant in Plaintiff's Exhibit 4–7 should be contrasted with the hired white applicants in Plaintiff's Exhibit 1–1, 1–11, and 1–12. Plaintiff suggests that the conduct which resulted in the black applicant being rejected, living with a person out of wedlock, was overlooked in the case of the white applicants. The applicant in Plaintiff's Exhibit 4–7 had a bad credit record as well as her co-habitation. Her credit record includes three judgments and five overdue accounts. It is clear from the recommendation of the investigator that the bad credit record of the applicant was as important a factor as the co-habitation. The investigation revealed that although the applicant wished to marry the man with whom she

was living, no marriage was planned because he did not wish to settle down. The couple had lived together for a considerable period of time, and a child was being reared in their home.

The applicant in Plaintiff's Exhibit 1–11, during a three-month interval, lived with a woman out of wedlock. The investigation showed that the applicant felt very bad about the incident. The applicant first went to live with his girlfriend after his mother had forged some checks on his checking account, and he came back to live with his mother after three months. The applicant was ashamed of the situation and expressed remorse to the investigator. Unlike the applicant in Plaintiff's Exhibit 4–7 this applicant had an excellent credit record.

The applicant in Plaintiff's Exhibit 1–12 also had a credit record without blemish. He was a former employee of the F.B.I. and had very good recommendations. The investigation revealed that this applicant moved in with his wife-to-be two months before their marriage when he came back from a trip to find that his roommates had moved out of the apartment they were sharing and he was stuck with the rent. Rather than pay the high rent alone, he moved in with his fiancee and moved their wedding date from August to May 1976. This was in March of 1976. The investigator recommended that this applicant be employed, but the Captain who reviewed the investigation recommended against the employment of this applicant solely on grounds of the two-month cohabitation prior to marriage. Colonel Burgess overrode the Captain's objections.

The applicant in Plaintiff's Exhibit 1–13 dated other women while he was separated but still married. The woman involved said

---

**15.** Rebuttals to the assertion may be observed in Defendant's Exhibit 122, which is a collection of background investigations of accepted black applicants. See Defendant's Exhibit 122–I (extramarital affair, unpaid doctor's bill, speeding charge not listed in application, investigator did not think applicant was frank, did

not recommend); 122–K (bad credit, left job without notice, lied to supervisor, not frank with investigator, not recommended by investigator); and 122–L (poor academic record, not recommended by several informants, considered immature by investigator, not recommended by two investigators).

that the relationship between her and the applicant was merely friendship and not an "affair," and that they had been to the movies together and to her home several times. This applicant had a good credit rating and only one speeding conviction several years earlier. He was not recommended for employment by one investigator because of his marital difficulties, but he was hired nonetheless.

The Court sees with respect to cohabitation fundamental difference between the situation of the black applicant who was not hired and that of the white applicants who were hired. The behavior of the white applicants who were hired is more properly compared with the behavior of the black applicant in Defendant's Exhibit 122(E). This applicant lived with his wife before marriage, but married her during the background investigation. The investigation revealed that he was $94.50 delinquent on his college loan. This applicant was offered employment by the Virginia State Police despite the fact that he was not recommended by the investigator because of his cohabitation and delinquency on his college loan. When the applicant declined to accept the employment offered, he was called by Captain Olive who attempted to get him to reconsider. This history of an effort to employ a black applicant who had cohabited before marriage with his wife-to-be demonstrates that brief ante-nuptial cohabitation by black applicants is considered by the Virginia State Police on the same basis as cohabitation by white applicants is considered.

This may be an appropriate point to remark that the Court is disturbed by the manner in which the Plaintiff has presented the evidence on disparate treatment of black applicants on the cohabitation issue. This presentation is the product of either a failure to glean the record or a failure to fairly present the evidence known to the plaintiff. In either case, the plaintiff's handling of the cohabitation issue has cast a pall over its entire case on the disparate treatment of black applicants in the background investigation.

With respect to poor employer references the plaintiff suggests that the black applicant in Plaintiff's Exhibit 4–11 should be compared with the successful white applicants for clerk-typist positions at Plaintiff's Exhibit 3–4 and 3–7. The black applicant in Plaintiff's Exhibit 4–11 was fired from a part time job in 1974 for not doing what her boss told her to do. The recommendations received from her present employment with Culpeper County were mixed—some recommended her while others said that her work was sloppy. Of the five "satisfactory" accounts mentioned by the plaintiff, one was three months behind in payment and one was one and one-half months behind and showed two late notices. This is in addition to the account rated slow and the New York account turned over to a collection agency. When the investigator went to the applicant's place of work, the Culpeper Juvenile Probation Office, the applicant was reading a book called The Prostitute and when she put the book down she put it in plain sight of visitors. The investigator said that the applicant is hard to understand when answering the telephone. The applicant said that she quit a part-time job on the ground that though she had been told by the manager when she was hired that she wouldn't have to stock shelves the assistant manager insisted that she stock shelves. This incident was the most important factor (named first by the investigator) in the investigator's decision not to recommend the applicant. This applicant was 21 years old when she applied.[16]

The white applicant in Plaintiff's Exhibit 3–4 was 35 years old at the time she applied. Her references at the Gravely Furniture Co. were mixed. Her immediate supervisor said the problem was incompatability and that her work was good. The appli-

---

**16.** Plaintiff's Exhibit 4–11 and several other exhibits submitted by plaintiff were difficult for the Court to decipher because of the apparent lack of care of the plaintiff in duplicating and preparing the exhibits for filing with the Court.

cant had an excellent credit rating. The investigator's visit to her place of employment found the applicant busy and neat.

The white applicant in Plaintiff's Exhibit 3–7 had mixed recommendations from the Salem Police Department. Her immediate supervisor said she was a good worker, while others said that she wasn't. The Roanoke County Circuit Court Clerk gave a bad recommendation but the investigator thought that the Clerk had confused the applicant with another girl by the same name who worked there at the same time. The applicant had a fair credit rating. The investigator said "nothing derogatory was developed in her background investigation."

The Court does not find that the applicants in Plaintiff's Exhibit 3–4, 3–7, and 4–11 are of equal or of nearly equal merit. Accordingly, the failure of the defendant to hire the black applicant is not evidence of racial discrimination.

Plaintiff questions the Superintendent's use of background investigations. The plaintiff argues that the reasons given by the Superintendent for rejecting the black applicant in Plaintiff's Exhibit 2–7 were in fact pretexts for racial discrimination. The Superintendent testified that he rejected the black applicant mainly because he admitted participating in a breaking and entering episode, had contracted venereal disease twice while being investigated, and had had his driver's license revoked for two charges of speeding. (Tr. 8–59). Exhibit 2–7 indicates that there was evidence in two interviews that this applicant's girlfriend was living with him out of wedlock. The applicant had a generally good employment record with only one bad recommendation, that of the Yellow Cab Company. The applicant's Exxon account was unpaid and had been turned over to a collection agency. Two cases of gonorrhea were treated shortly before his background investigation began. The breaking and entering charge was a juvenile charge against the defendant which was nolle prossed. The defendant asserts that the investigator's report on the applicant's criminal history which was attached to the background investigation showed that the applicant admitted direct involvement in the crime. The Court accepts that as an accurate representation though the report furnished as a part of Plaintiff's Exhibit 2–7 is almost illegible. The defendant also claims that the Department of Motor Vehicles record which is listed as an attachment to the report in Plaintiff's Exhibit 2–7 reflects that the applicant's driver's license had been suspended. This record was omitted from Plaintiff's Exhibit 2–7. The Court cannot conclude on the basis of this evidence that the Superintendent's reasons for refusing to hire this applicant are mere pretexts for racial discrimination.

The plaintiff impugns the professed skepticism of the Superintendent about the honesty of the black applicant in Plaintiff's Exhibit 2–12. The background investigation reveals that this applicant had a very poor academic record, but was very highly recommended by his current employer and had excellent credit. He was recommended for favorable consideration by the investigator. The investigation revealed that he had been convicted of passing a bad check in December, 1968, nine years before the background investigation. The applicant was sentenced to pay the amount of the check and court costs but was not fined. The applicant gave a satisfactory explanation of the circumstances behind his bad check charge.

The investigation also revealed that the applicant got his Virginia driver's license in 1965 by lying about his age. When the investigator first confronted the applicant with this discrepancy, he said that at the time he thought that his age was correct. The next day the applicant told the investigator that he had lied to the investigator on the previous day, and that he had in fact advanced his age when he applied for his driver's license in order to get a license to be eligible for a job. After he was rejected, this applicant spoke to Captain Olive about the circumstances surrounding his rejection. Captain Olive wrote that but for this mis-

representation to the investigator, he would have recommended reconsideration to the superintendent. It is true that had the applicant not voluntarily revealed his misrepresentation to the investigator, the lie would have gone undiscovered. Nevertheless, the incident showed that the applicant would succumb to the temptation to tell a lie when it was to his advantage.

This is contrasted by plaintiff with the white applicant in Plaintiff's Exhibit 32–6, who is presently employed by the Virginia State Police. This applicant also advanced his age one year to get a driver's license. However, the applicant volunteered this information to the investigator, and never misrepresented the circumstances. The investigation revealed that he moved his age up one year so that he could get a license to drive a truck while his father was sick. The two applications on this issue are not of equal weight. It is clear from the contemporaneous memorandum of Captain Olive that the misrepresentation that concerned the Virginia State Police in considering the application in Plaintiff's Exhibit 2–12 was not the original misrepresentation to get a driver's license, but the misrepresentation to the investigator at the time of the background investigation. No such misrepresentation appears in Plaintiff's Exhibit 32–6.

Plaintiff is critical of the investigator's conclusions with respect to the academic record of the black applicant in Plaintiff's Exhibit 2–2. This applicant graduated from high school 86th in a class of 143. The investigation revealed that one possible explanation for this low class standing was the applicant's part-time work during his high school career. However the Court believes that this applicant's poor academic record had very little to do with his not being offered a job. The applicant's wife told the investigator that she was amazed that the Virginia State Police could find people to work for such low pay as they were paying. She said that she opposed her husband's taking the job of trooper because it would mean that she could not go to college. The applicant said that his take home pay at the time of the investigation was between $16,000–$18,000 [17] and he was clearly concerned that he couldn't get by on a trooper's salary. In the course of the background investigation, the applicant withdrew his application, then asked later to be considered. It is not surprising that this applicant was not offered a position with the Virginia State Police.

The plaintiff claims that the background investigation of the black applicant in Plaintiff's Exhibit 32–7 shows bias on the part of the investigator because the investigator questioned the applicant's veracity in concluding that the applicant was involved with a woman who was separated from her husband. The plaintiff points to the fact that both the woman and the applicant denied that the relationship was a romantic one. Both claimed that they were just good friends. The investigator, however, after face-to-face interviews with both parties formed the conclusion that each was attempting to conceal the true nature of the relationship. Surely the investigator would have been derelict in his duty had he not given the Superintendent the benefit of his conclusion in this matter. The applicant also wrote on his application that he had left his first job to "return to school." His employer, on the other hand, said that he was fired from this job when he failed to report to work one day, and the applicant admitted this to be true, but said that he could get the job back anytime he wanted. Under these circumstances, the Court cannot conclude that the investigator's opinion as to the veracity of the applicant is the result of racial bias.

The plaintiff contends that the background investigation in Plaintiff's Exhibit 2–6 is incomplete, inaccurate, and misleading. This black applicant was not recommended for police employment by his supervisor at his previous job with the Richmond

17. The top salary of a trooper after nine years was $13,728 and the beginning salary was $9,600 in 1976. Defendant's Exhibit 104, App. C.

Public Schools. The plaintiff says the background investigation reflects that he converted to his own use a $7.00 check. Actually, the background investigation reveals that he accepted a check from a client of his employer and then failed to turn it in to his employer. He said he lost the check when asked later. His supervisor at the Richmond Public Schools also claimed that the applicant was a sloppy dresser and once used a school camera for personal gain. The background investigation reflects that this applicant had two bad credit accounts in 1972. The investigator reported that the applicant came shabbily dressed to his interview and that the interview indicated that the applicant could not accept close supervision without rebellion. The plaintiff complains that a letter from the applicant's present employer was not included in the investigation. However, the letter was included in the file and would have been available for review by the Superintendent when making his decision whether or not to hire the applicant. The letter arrived at the Virginia State Police before the investigative report was typed up but after the investigation was completed, according to the dates on page one of the investigation. The investigator's report of the applicant's interview does not reveal any explanation from the applicant as to the supervisor's statement that the applicant had lost a $7.00 check and had used a camera belonging to his employer for personal gain. This is somewhat unusual, at least judging from the investigations that the Court has reviewed in this case, but it is not sufficient to base a conclusion of racial discrimination.

The plaintiff complains of the investigator administering a literacy test to the black applicant in Plaintiff's Exhibit 2–5. The investigator had the applicant write a short paper on why he wanted to be a trooper and asked the applicant to read two sections of the Code of Virginia. The plaintiff contends that "such measures were not taken with similarly situated whites and suggests further harassment of black applicants." However, the evidence shows that the white applicant in Plaintiff's Exhibit

1–4 also was given a writing test. On page ten, paragraph three of the background investigation, the investigator talks about "reviewing _____'s essay" and asking the applicant about his spelling errors. Despite plaintiff's claim in its brief that such measures were not taken with "similarly situated whites," plaintiff was aware of this writing test given to this white applicant. On page twenty-nine of plaintiff's post trial brief, the plaintiff points to this applicant as a white applicant with four or five unfavorable factors including the factor "cannot spell (p. 10, BI)."

Plaintiff refers to the background investigation of the black applicant in Plaintiff's Exhibit 2–5 as being distorted because the investigator listed fourteen notices sent to the applicant in an account that should have been paid on 27 March 1972 but was actually paid on 18 April 1972. The background investigation clearly reflects the fact that the applicant got behind in his payments by one month and never caught up. This was the occasion for the fourteen notices. The investigation also reveals four credit accounts that reflected late payment. There was, in addition, sufficient cause not to hire this applicant independent of both his academic ability and his credit problems as the Court has noted above.

### D.

#### a.

In addition to its review of the investigation reports plaintiff presented the testimony of three black applicants for trooper positions who failed to pass the background investigation. One of these, Harvey Louis Graves, testified that an investigator for the Virginia State Police disclosed to Graves' wife some information that was developed in the course of the background investigation which had a deleterious effect upon his relationship with his wife. He also testified that he withdrew his application for a trooper position after the investigator warned him that if the investigation disclosed that he had violated the law he might be prosecuted for that

violation. Graves testified that he was not afraid at the time of the investigation that any information would come to light indicating that he had broken the law. Graves said that the effects on his relationship with his wife and the fact that he did not wish to be concerned with even baseless prosecution caused him to withdraw his application.

The Court finds Graves' testimony somewhat enigmatic. It definitely shows that something unpleasant happened to Graves in the course of his background investigation. However, there is nothing in the testimony to indicate that Graves was or that he felt he was being discriminated against because of his race. The testimony excludes the nature of the disclosure by the investigator to the applicant's wife of the "personal and private" information. There is no indication of what prompted the investigator to tell Graves that if the investigation revealed a violation of the law that Graves would be subject to prosecution. Having read scores of investigative reports and having taken note of the careful, detailed objectivity of the investigative officers the Court cannot assume from the happening of the event that racial discrimination was involved.

The plaintiff also presented the testimony of Charles Melvin White, who applied for a trooper position with the Virginia State Police in 1969 or 1970. This is, of course, prior to the effective date of the Act. White was not offered a position. After he was rejected, he went to see Colonel Burgess to ask why he had not been offered a position. According to White, Colonel Burgess told White at the time that he had personally reviewed White's file. Burgess mentioned the fact that White had been involved in a labor dispute and had once been arrested for disorderly conduct. Tr. 1–151–55. In his testimony, Colonel Burgess said he rejected White because there was some question about his emotional stability, and because he had been involved as a leader in a labor dispute involving some violence. Colonel Burgess felt White would have difficulty remaining neutral in labor disputes which he might be assigned to control as a State Trooper. Tr. 7–59.

There are some very positive factors in White's record, including his honorable military service and his quest for a college education, which would lead the Court to believe that he might well have made an excellent State trooper. However, the Court cannot conclude, as the plaintiff would have it conclude, that Colonel Burgess was motivated by racial discrimination in refusing to hire White. The concerns expressed by Colonel Burgess are real ones, and the Court finds that they were not used as a pretext for racial discrimination.

The plaintiff presented the testimony of Michael Lee Patillo, who applied for employment with the Virginia State Police in November, 1974. Patillo believes that he was harassed in the course of his background investigation. He testified that the investigators didn't give him time to think over the questions or answer them completely and that the investigator tried to discredit his answers. He also said that the investigator asked him if he were a homosexual and if he were unsociable. When Patillo was taken for a driving test, a standard procedure in a background investigation, the car he was driving was struck from the rear by another car. Patillo said the investigator told him after this incident, "Now you can go tell your mother this." Patillo said that he felt his mother had nothing to do with the accident, and reported that the investigator had also asked if he was somewhat attached to his mother. Tr. 1–156–64.

Colonel Burgess testified that the background investigation on Patillo showed that he was immature and had a great deal of dependence on his mother. Tr. 7–77. Colonel Burgess also pointed out that Patillo was not recommended by five former employers, and that he had left two jobs without giving notice. However, Colonel Burgess made it clear that Patillo's apparent lack of maturity was the main factor in his decision not to hire Patillo. Having observed the witnesses the Court sees no rea-

son not to credit Colonel Burgess' testimony.

The plaintiff also introduced evidence that showed that some background investigations included references to the applicants' race such as "The applicant is an above-average black person." Two of the offending investigators, L. W. Coffman and Otto Wegman, were called by the plaintiff to explain these references to race. The Court finds that such references to race in the background investigation submitted by investigators on a few black applicants are innocent of any anti-black animus and were intended by the investigators to be descriptive only.[18] This conclusion is bolstered by the fact that these characterizations are found in files of black applicants recommended for employment by the investigators.

Considered as a whole, the background investigations adduced by the plaintiff do not show a pattern or practice of racial discrimination. Nor do any of the individual background investigations reveal racial discrimination against any individual applicant. The defendant has, in every case, met its burden to "articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). The plaintiff has not shown that the legitimate reasons stated by the defendant and found by the Court in this case were mere pretexts for racial discrimination.

To the contrary, the Court, having observed the responsible witnesses in open court and having considered the factors that enter into the weight and value of witnesses' testimony, concludes that the bases advanced were valid and true. The background investigations and the decisions to hire or not based thereon are, so far as the Court can discern, free from racial taint or bias. Every applicant accepted for employment as a State trooper can be assured that he or she meets the same high standards as his fellow troopers unblemished by racial considerations. Accordingly, the plaintiff's claim that the background investigation was used as an instrument of racial discrimination must fail.

b.

Of all the blacks who have been hired by the Virginia State Police and despite the extensive discovery and investigation conducted by plaintiff, plaintiff presented the testimony of only two who claim to have been subjected to racial discrimination after being hired by the Virginia State Police. Hollis Lee Jackson was appointed a conditional trooper on 31 July 1976. One month later Jackson resigned his conditional appointment in the Virginia State Police. On that day Jackson was called to the office of Sgt. Rockecharlie, his area supervisor, to discuss a summons issued against him in Charlotte County for nonsupport of an illegitimate child. Jackson claims that the Sergeant proposed to conduct an investigation into the circumstances surrounding the summons which would consist of asking the woman who had obtained the summons whether or not Jackson was the father of her child. Jackson further claims that Rockecharlie gave him the impression that if he resigned, went to Charlotte County and resolved the situation, he could be reinstated. Jackson claims that Rockecharlie got a secretary to type up a letter of resignation and placed the letter before Jackson for his signature. Jackson signed the letter of resignation and left for Charlotte County to try to resolve the problem. When he had been cleared of the charge against him, Jackson returned to the area office to be reinstated. Jackson was told for the first time, however, that State Police policy does not permit reinstatement of troopers who resign.

Sgt. Rockecharlie denied that he told Jackson that if Jackson resigned and got

---

**18.** One investigator explained that most blacks living in the applicant's area subsisted in substandard, rural housing and survived on marginal incomes. He wanted to make it clear in his report that applicant was not a part of this setting.

the matter cleared up he could be reinstated. Rockecharlie also testified that Jackson never denied the allegation that Jackson was the father of the child, and in fact admitted to having sexual intercourse with the woman involved and to paying $20.00 a week to this woman over a substantial period of time for support. Tr. 8–87, Defendant's Exhibit 127. Rockecharlie further testified that Jackson asked him specifically what his alternatives were in this matter, and Rockecharlie told him that one of his alternatives was to resign. Rockecharlie stressed that he did not explain to Jackson the consequences of his being found innocent of the charge against him because Jackson had admitted to him that the charge was valid.

The Court observed both these witnesses, and determines that insofar as their recollections differ, Sgt. Rockecharlie is telling the truth.[19] The Court can find no fault with his handling of the situation raised by the complaint against Trooper Jackson. It may be that the State Police policy against rehiring troopers who resign is too rigid and may result in some injustices. However, it is not the province of this Court to review personnel policy laid down by the Department of the State Police. The evidence is clear that this policy is applied equally to both black and white troopers who resign. The policy is published in the handbook of the Virginia State Police which was issued to Trooper Jackson. The Court can find no evidence of racial discrimination in this incident.

The plaintiff presented the testimony of Therod C. Quarles who entered the basic training school of the Virginia State Police in November of 1976. Quarles was hired after the Virginia State Police had dropped the written test requirement for all applicants. In December, 1976, Sgt. Grimes discussed with Quarles the fact that he was failing the training school at that time. On 10 January 1975 Quarles was informed that he was still doing unsatisfactory work and was given the choice of "going before the

board or resigning." Tr. 1–145. Quarles resigned. The next day, Quarles recomputed his average and decided that he had a passing average. Although it is clear that Quarles felt the people at the training school were hard on him, and that they had made a mistake, Quarles never says that he believes that the actions of the Virginia State Police personnel were motivated by racial bigotry.

The defendant presented the testimony of Cpt. Charles M. Robinson, training officer for the State police, who testified that Quarles was informed of his right to appeal the decision to terminate his conditional appointment. Robinson also testified that he recomputed Quarles' grade average and found it to be failing, despite Quarles' claim to the contrary. Robinson's testimony shows that Quarles raised his grade point average from 69.2 to 72.75 between 6 December 1976 and 6 January 1977. Tr. 147–50. It is clear that Quarles was improving somewhat and this may be the source of his confusion as to his grade point average. The fact that he may have done passing work during the month of December, however, was not sufficient to bring his grade point average above the 75 mark. It may be that if Quarles had chosen to go before the Board of Review, that this improvement would have led the Board to recommend that he be retained. However, the record shows that the choice of whether to resign or to go before the Review Board was entirely up to Quarles. There is absolutely nothing in this incident to support a charge of racial discrimination against the defendant.

Trooper David Green, the black trooper who has been longest with the force, was asked by the Court if he found any racial discrimination in the Virginia State Police. Green's answer was straightforward: "No, Sir, I do not. If it's there, I cannot detect it in no kind of way." Tr. 6–30. Trooper Green was a frank and candid witness. The Court was very much impressed with his

---

19. Jackson's explanation to Sgt. Rockecharlie as to how it happened that he got the woman pregnant is fantastically unbelievable. Defendant's Exhibit 127.

demeanor on the witness stand. He impressed the Court as an active and intelligent member of the Virginia State Police. If racism in the Virginia State Police were a problem, the Court has no doubt that Trooper Green would have so informed the Court despite the presence of his Superintendent in the courtroom.

The Court also heard the testimony of Trooper Cheryl L. Nottingham, the first female State trooper in Virginia. In addition to denying that she had been subjected to any discrimination because of her sex either at the training school or in her subsequent career, Trooper Nottingham testified that she saw no discrimination against the black troopers in her training class. Tr. 9–186. Trooper Nottingham also testified in response to a question from the Court that the instructors in the basic training school were no harder on the black trainees than they were on the white trainees. She indicated they were hard on everybody. Tr. 9–190. Trooper Nottingham also impressed the Court as a frank and honest witness. The Court believes it is highly significant that she, a minority member, saw no evidence of discrimination in the training school. In addition, Trooper Nottingham was a member of the same training school class as Therod Quarles. She testified that Quarles didn't seem to care about becoming a trooper, and indicated he wasn't sure from one week to the next whether he wanted to return to the training school.

The Court concludes, on the basis of this testimony as well as the other testimony in the case, that the Virginia State Police did not engage in racial discrimination in the training school or in the day-to-day operation of the Department.

### E.

The plaintiff contends that the recruiting efforts of the Virginia State Police for both black and female applicants are inadequate and discriminatory. Plaintiff cannot and does not argue that the defendant has not engaged in minority recruitment. The argument is, instead, that the program of minority recruitment carried out by the Virginia State Police is inadequate.

The fundamental problem with this argument, however, is that it properly should include proof of what would be an adequate program. No such proof has been offered by the plaintiff, although some notion of what the plaintiff's attorneys feel would have been a more adequate program can be gleaned by an analysis of their criticism of the program that the Virginia State Police actually ran. There is no evidence in the record to show that such a program—depending heavily upon use of mass media and the employment of numbers of minority recruiters with their administrative support, all framed in the latest affirmative action techniques—would have had one iota more effect than the efforts of Trooper David G. Green, canvassing Virginia alone in his State police cruiser talking to prospective applicants one-on-one. Indeed, the testimony of Col. Richard A. King, Chief of the Fairfax County Police Department, shows that Fairfax County was unable to achieve better results than the Virginia State Police despite a considerable investment in recruiting and a substantially higher pay scale. Tr. 1–50, 63. If Chief King's program was intended as a model it is significant that the model does no better than the Virginia State Police recruitment program.

There is no indication in the record of a lack of funding for the minority recruiting program. Trooper Green was assigned by the Virginia State Police as a minority recruiter in January 1973. Until that time, the Virginia State Police had never sought actively to recruit any person, white or black. It was considered that recruiting was unwise since applicants should be self-motivated to be a State trooper. It is not surprising under these circumstances that no one in the Virginia State Police would be familiar with recruiting techniques. The evidence shows that Trooper Green never experienced any hindrance in the performance of his recruiting duties. To the contrary, he was uniformly assisted and en-

couraged by his superiors. The record shows that the recruitment effort mounted by the Virginia State Police, though lacking in sophistication, was a good faith and productive effort to attract black applicants to become State troopers.

The plaintiff contends that the applicant flow data reflects the inadequacies of the Virginia State Police minority recruitment program. The evidence shows that the applicant flow with the Virginia State Police was 10.8% black. The Court has already considered the question of the applicable labor market figures, and has concluded that the applicable labor market statistics have not been proven by the plaintiff. Thus, plaintiff has not shown that blacks apply to the Virginia State Police in disproportion to their numbers in the relevant labor market. Indeed, the applicant flow is closely in line with defendant's view of the relevant labor market—a view which the Court finds appropriate. There being no proof to support it plaintiff's attack upon the recruiting policies of the defendant must fail. Moreover, defendant has shown that its recruiting policies are not discriminatory against blacks[20] and are in fact, the result of a good faith effort to seek out black applicants.

The evidence shows that the efforts of the Virginia State Police to attract black applicants have been the subject of widespread news publicity since the beginning of the minority recruitment program in early 1970. These efforts were even the subject of heated controversy when William Robertson, Governor Holton's assistant for minority affairs, publicly chastized the black citizens of the State for their failure to take advantage of the employment opportunities offered in the Virginia State Police. No single feature of American society has characterized it more completely over the past 25 years than the thrust for racial equality. If there are *any* eligible members of the minority community in Virginia who are unaware of their right without regard to race to obtain employment with the Virginia State Police, then this Court would be very much surprised. Certainly, nothing in the record of this case would lead the Court to believe that there exists any such person. To create such an awareness is the purpose of minority recruitment.

Accordingly, the Court finds that the recruitment policy and program of the Virginia State Police does not discriminate against blacks.

VII

The plaintiff has presented and the Court has considered in this case a massive amount of evidence intended to show that the Virginia State Police discriminated against black applicants for trooper positions and black conditionally-appointed troopers since the effective date of the Act, 1 July 1973. The testimony of two conditionally-appointed troopers who were arguably forced to resign because of their race, the testimony of four trooper applicants who arguably were not given equal consideration and thus were not hired because of their race, the background investigations of twelve black trooper applicants, and eleven black applicants for civilian positions which arguably show discrimination against black applicants by the background investigators or by the persons responsible for hiring decisions in the Virginia State Police, all have been brought before this Court. This evidence, a result of months of massive pretrial investigation, has been carefully sifted and weighed and in each instance, the Court has found that the individual involved was not the victim of racial discrimination. Nevertheless, it would appear from the very bulk of the evidence in this case, and from the many allegations of racial discrimination, that there *must* be some racial discrimination practiced by members of the Virginia State Police. Where so much smoke is found, it is hard to believe that there is no fire.

However, a closer analysis of the allegations raised by the plaintiff in this case, and

---

**20.** Defendant still has no program aimed at recruiting white males.

the proof presented to support those allegations, shows that the proffered evidence of discrimination is in fact very sparse. No black trooper who has successfully completed the training school has come forward with a complaint of racial discrimination. From hundreds of black applicants the plaintiff has found only 23 who support even a colorable claim of racial discrimination. Out of hundreds of background investigations, the plaintiff has presented only 21 that show signs of racial characterization. At one point during the trial, plaintiff's counsel assured the Court that plaintiff's evidence represented not the tip of the iceburg, but the whole iceburg. Tr. 6–73. If this be so, and the Court has no reason to think that it is not, then the very fact that the evidence of racial discrimination presented by the plaintiff is so sparse is significant.

As the Supreme Court said in *Teamsters*: [B]ecause it alleged a systemwide pattern or practice of resistance to the full enjoyment of Title VII rights, the Government ultimately had to prove more than the mere occurrence of isolated or "accidental" or sporadic discriminatory acts. It had to establish by a preponderance of the evidence that racial discrimination was the company's standard operating procedure—the regular rather than the unusual practice. [431 U.S. at 336, 97 S.Ct. at 1855.]

The plaintiff's burden of proof in this pattern or practice suit under the Crime Control Act is the same. Thus, the fact that the plaintiff's evidence is in fact so scarce weighs heavily with the Court. The plaintiff's inability to glean more than this from a record which is no less than five feet thick bolsters the Court's view that the Virginia State Police have not engaged in a pattern or practice of purposeful racial discrimination since the effective date of the Act. Indeed, the Court has grave doubt that the non-purposeful racial discrimination proven—that with respect to dispatcher hiring—is sufficient to support a pattern or practice finding as defined by *Teamsters, supra.* Less than half a dozen black dis-

patcher applicants were screened out by the written test during the entire relevant period. See Table VII. Less than a hundred of approximately 1500 employees of the Virginia State Police are dispatchers. In addition, the use of the written test was not intended to discriminate against blacks and was discontinued by the defendant more than two years ago.

But the record shows that the defendant never even attempted to justify its use of the written test for dispatcher positions despite the strictures of the Act which compelled a careful review of all hiring policies to remove any vestige of discrimination. The defendant had a policy of hiring as dispatchers only those applicants who passed the written test. The defendant's failure to recognize the disparate impact of that test and take corrective action even in this relatively minor regard must be considered a pattern or practice in violation of the Act.

## VIII

The Court has found that the Virginia State Police has engaged in unlawful and discriminatory hiring practices against women by means of height and weight requirements and derelictions in recruiting. The Court has further found that the Virginia State Police engaged in an unlawful employment practice in that it used a written test as a screening device for applicants for the position of dispatcher which, although it had an adverse impact upon black applicants, was not shown to be a valid predictor of job performance. In all other respects, the Court finds for the defendant.